Leighton v. Orr.

LEIGHTON, NEXT FRIEND, ETC., v. ORR.

THE SAME v. THE SAME.

LEIGHTON, ADM'R, ETC., v. ORR.

1. **Practice**: SUBMISSION OF CAUSES TOGETHER. An agreement between the parties that an action at law and an equitable action shall be tried by the court at the same time and upon the same evidence, does not have the effect to change the character of either of the actions.

2. ——: FINDING OF FACT: EFFECT OF. The finding of a court upon a matter of fact in an action at law has the effect of the verdict of a jury, and will not be disturbed if there is any evidence upon which to base it.

3. **Will**: JURISDICTION: PRACTICE. The probate of a will is not conclusive upon parties adversely interested, and an original action in the District Court will lie to set it aside.

4. **Conveyance**: FRAUD AND UNDUE INFLUENCE. W. lived for years in unlawful relations with a woman who shared his home, and who claimed

to be a spiritualistic medium, and to have daily communications with his deceased wife, whose memory he greatly revered; during this time she acquired great influence over him and controlled him to a large degree in the management of his business affairs; at the same time he was addicted to the use of alcoholic liquors to such excess that he became very much debilitated in mind and body; previous to his death he conveyed large portions of his property, for the consideration of "one dollar and friendship," to the woman with whom he had been living in adulterous intercourse: *Held*, that the conveyances should be set aside, on the ground that they were procured by undue influence.

5. ———: ———: WHAT CONSTITUTES.    Influence obtained by the use of unlawful means, or immoral and indecent conduct is undue influence, and the party exercising it cannot be permitted to derive advantage therefrom.

6. ———: ———: BURDEN OF PROOF.    The burden is upon the party asserting the validity of a conveyance obtained from one with whom he lives in confidential relations, to show that it was not procured by an abuse of the confidence or by undue influence.

7. ———: ———: UNLAWFUL COHABITATION.    The exercise of such influence will be presumed where the grantor and grantee are living in unlawful cohabitation, in the absence of proof of a valid consideration for the conveyance.

## *Appeal from Lee District Court.*

### THURSDAY, DECEMBER 7.

THE object of the first of the above actions is to set aside as fraudulent, and because obtained by reason of undue influence, certain conveyances of real estate made by Arthur Wolcott to the defendant.

The second to set aside for the same reasons, a will of the said Arthur Wolcott, whereby he devised to the defendant the real estate described in said conveyances.

The third, to recover a certain sum of money of the defendant, which it is alleged she obtained of said Wolcott, by or through fraudulent means and undue influence.

These three causes were submitted to the court below under the following agreement: "It is agreed by and between the parties to the above named suits that they shall be tried and determined by the court at the same time.   That the evidence taken in each case shall be used in all cases, so far as the same

is competent and material." The District Court found for the plaintiff, and ordered judgment accordingly. The judgment or decree is contained in a single record entry, but refers to each cause of action in separate paragraphs, and amounts to three separate judgments. There is but a single appeal, and the three causes are thus before this court.

*Miller & Sons, Gibson Browne* and *C. W. Lowrie,* for appellant.

*Gillmore & Anderson* and *Craig & Collier,* for appellee.

SEEVERS, CH. J.—This appeal brings before us three separate and distinct causes of action. Two of them being ordinary proceedings or actions at law, and the other an equitable proceeding. The agreement as to the submission of these causes and the trial thereof by the court at the same time and upon the same evidence, so far as material, cannot have the effect to change the law actions into equitable, or the latter into the former. At most, the agreement amounts in this respect to a waiver of a jury in the law actions, and this it was competent for the parties to do. Code, § 2814.

1. PRACTICE: submission of causes together.

The third action, being for the recovery of money, is without doubt an ordinary proceeding or action at law, and in reference thereto the only finding of fact made by the court below is "That one Andrews, on the 30th day of November, 1873, paid the defendant under a pretended authority the sum of $842 of money in his hands, belonging to the estate of Arthur Wolcott, deceased, and that she is now indebted to said estate in said sum, with interest," and judgment for the sum so found due was accordingly rendered.

This judgment is undoubtedly correct, if the fact found by the court is warranted by the evidence, or if it be true, as insisted by counsel for the appellee, that being an action at law this court cannot reverse the judgment unless there is an absence of any testimony tending to sustain the finding of fact. In other words, it is insisted the rule is well established that the finding of a court as to a mat-

2. ——: finding of fact: effect of.

ter of fact in a law action has the force and effect of a verdict of a jury, and cannot be disturbed if there be any evidence upon which it can be sustained, and this without doubt is the rule. Code, § 2743; *Hamilton v. Iowa City Nat. B'k*, 40 Iowa, 307. If the evidence is of the character that different minds might come to different conclusions, or if it can be said there is any evidence upon which the finding of the court or verdict of a jury can be based, this court cannot interfere.

The money in controversy belonged to Wolcott, and a few days before his death he directed Andrews to collect it and give it to the defendant. It was claimed at the time he made this gift that Wolcott was insane, and the gift was procured through undue influence, and there was evidence tending to support these allegations. Whether sufficient or not, in our judgment, we do not determine. Undoubtedly it was deemed sufficient by the court below, as such is the result of the finding.

Had this action been tried by itself before a jury, and a verdict found for the plaintiff, certainly under the repeated decisions of this court such verdict could not be set aside by us, and the same rule must prevail, notwithstanding the anomalous standing of these causes in this court.

The same rule must apply to the action to set aside the will, the finding and judgment of the court in reference thereto 3. WILL: ju-  being that said pretended will "be, and the same risdiction : practice.     is set aside and held for naught, the same having been procured by undue influence, and while the said Arthur Wolcott was not in sound and disposing mind or memory, and not capable of executing the same, and that said M. M. Orr has no right, title or interest in said property or any part thereof," unless, as counsel for appellant claim, the probate of the will in the Circuit Court is conclusive and cannot be attacked in this action, or because the District Court has no jurisdiction, or the action is equitable.

The will in controversy was admitted to probate by the Circuit Court of Lee county. There is nothing, however, in the abstract to indicate there was any contest or that plaintiffs appeared in the matter of such probate.

That the admission of a will to probate is not conclusive on

parties adversely interested, and that an appeal therefrom might be taken, or an original action brought to set aside the will, was settled in *Havelick v. Havelick*, 18 Iowa, 418; *Gilruth v. Gilruth*, 40 Iowa, 346; and such, we believe, is the express provision of the Code, § 2353.

Nor does § 2312 of the Code deprive the District Court of jurisdiction, where an original action is brought to set aside the will. That section has reference only to the probate, and none whatever to an original action. The District Court cannot admit a will to probate for want of jurisdiction over the subject matter; not so, however, as to an original action to set it aside.

Courts of equity never had jurisdiction of an original action to set aside a will procured through fraud or undue influence. But such has always been held to be an action at law, in which either party was entitled to a jury trial. 1 Story's Equity Jurisprudence, § 184, note; and this is clearly intimated if not expressly determined in *Gilruth v. Gilruth, supra*.

The action to set aside the deeds is equitable, and the defendant has the right to a trial *de novo* in this court. The ground

**4. CONVEYANCE: fraud and undue influence.** upon which this action is based is stated in the petition as follows: That the defendant, by the use of "impure, foul and improper practices and devices, and having thus procured such undue influence over the weak and unsound mind and understanding, she thus thereby procured the said Arthur Wolcott to execute two several conveyances to her without consideration, and under undue influence, * * which said pretended conveyances are fraudulent and void, having been procured under undue influence and without consideration, and while the said Arthur Wolcott was *non compos mentis*, and of weak and unsound mind and understanding."

The improper practices and devices relied on are stated in the petition, but it is deemed unnecessary to set the same out at length.

The answer denies generally and specifically the allegations of the petition, and insists that Wolcott was sane, and the deeds were not procured through undue or improper influ-

ences. The affirmative allegation in relation to the execution of the deeds being, that "said conveyances were made for a consideration good and valuable while Wolcott was sane."

The conveyances on their face show the consideration to be "One dollar and friendship." One parcel of the property is worth $3,500, and the other $2,500. The answer does not set forth any of the circumstances attending or surrounding the execution of the deeds, but relies entirely on the general and specific denial of the allegations of the petition, that Wolcott was insane, or that the deeds were obtained through undue influence, and the averment in relation to the consideration, above stated.

Wolcott was about fifty-six years of age when he died. He had been twice married. His first wife, to whom he was greatly attached, died in 1850. In five or six years after her death he married his second wife, with whom he lived some years, and from whom he was divorced. Whether he became intimate with the defendant previous to such divorce is not entirely clear from the testimony. Mrs. Orr states that she knew him for about ten years prior to his death. Shortly after the divorce Mrs. Orr, whose husband was living, moved with her family, consisting of her husband and two children, into Wolcott's house, and they all lived together as one family (except that Mr. Orr was frequently if not mostly absent), from that time until Wolcott's death, the expenses of the household being borne by him. For the last five or six years of his life Wolcott was frequently intoxicated, and was greatly addicted to the use of spirituous liquors. Doctor Collins was called to see him during his last sickness, and about three weeks before he died, and Doctor Carpenter was called in as a consulting physician on the 21st day of November, 1873. Doctor Collins states that Wolcott was laboring "under nervous depression; this seemed to be caused by looking back on a misspent life in the way of dissipation. He appeared to me as any other man would after he had a debauch — he had the blues. The first time I saw him he was considerably prostrated and debilitated in his nervous system. This would extend to his brain. * * There was quite extensive alco-

holization of Wolcott's system. I think his condition was owing to other causes in connection with drinking; he was almost daily in the habit of bringing his nervous system to a height of excitement as a medium; just in proportion as he excited himself, just in proportion he would fall below when relieved of excitement.    *     *   "

Dr. Carpenter states: "He seemed to be in a condition between melancholy and excitement, sitting in his office on a chair with his head on his hand; I inquired into his habits for a few months next preceding his sickness; he said he had subjected himself to a good deal of excitement under the influence of alcohol for, I think he said, two or three months previous to that time; that he did not expect to get well; did not believe any medicine would relieve him. I inquired with reference to his memory; he stated his brain was in a whirl; * * Mrs. Orr was always present when I made my calls; if I entered the room when she was absent she would immediately come in; I frequently noticed there were eavesdroppers behind the partition; I could not tell who it was; Mrs. Orr stated that during the drinking he would stop and gaze upon a spirit picture, as she called it; alcohol ranks next to hereditary insanity; I should say, from his condition, that alcoholism had possession of his system for many years; no moderate use of alcohol left his brain in that state  *  * ."

Wolcott died on the 27th day of November, 1873; five days previous thereto, he made the will before referred to, in which he devised to Mrs. Orr the property described in the deeds, and the residue of his estate to the infant plaintiffs.

Previous to the time Mrs. Orr became an inmate of Wolcott's house he became a believer in spiritualism. He professed to heal diseases magnetically—that is, by rubbing the patient with his hands. Mrs. Orr sent for him as a physician; she was then investigating spiritualism. Wolcott furnished her books and she became a confirmed spiritualist, and her testimony on cross-examination is as follows:

"I claimed to have frequent interviews with Wolcott's deceased wife; she was always with him; I could see her daily; I frequently spoke to Wolcott of seeing Sarah around

the house; I claimed that she was more visible in the early part of our acquaintance than latterly; I claimed that she began to make her appearance as other spirits, shortly after Wolcott and I began to reside together; I claimed she made communications to me just the same as the other spirits; of course she did not make the same communications that other spirits did, for all spirits are not of the same mind; I claimed to Wolcott that Sarah did make communications to me, and. I represented to him during that seven years that I was in almost daily receipt of communications from her, and all communications that were given to me were communicated by me to him; sometimes communications were in writing, not all of them; I claimed I wrote the exact words as I heard them or was impressed; the difference between a trance and a semi-trance is, one is conscious and the other unconscious; in the conscious state I had an imperfect knowledge of what was going on around me; when I was having the picture of Sarah painted I did claim to have received a communication as to how it should be painted, and I had some parts of the picture changed—the hair; P2 is the picture from which the painting was made; I directed the painting of the hair; I saw the hair was not arranged as it did not correspond with the spirit picture, or as I saw her; this painting is the same one I handed to Col. C. H. Perry to show his wife; in the picture, P2, Mr. Wolcott and I sat with both hands clasped, because it produces harmony, and concentrates the forces which the spirits need to be materialized sufficient to be photographed; there was no necessity of my occupying the position which the photograph discloses, only as a test to him, I saying beforehand she would appear; the spirits I saw were behind us in taking the picture, not in front by the camera; I did see the middle figure, as shown on the plate; I felt her hand on my shoulder, and saw her mentally; I could not see behind me with my natural eyes; I did perceive a spiritual presence, the picture which appears on plate P2, and many others; I am sure I stated that I saw it at the time the picture was being taken; I could not foretell that Sarah would appear; she said she would come and she kept her promise;

I did not convey the idea she would come, only that she had promised to come; it was this promise of hers I had communicated to Mr. Wolcott; the spirit of Sarah promised she would meet me anywhere when the conditions were such that she could present herself; it was a matter of faith, I presume, that I told Mr. Wolcott that she would appear on that occasion, because she had promised to do so; Sarah made her promise to me, to appear at my house first, I believe; she had promised to give us a picture many years before, when the conditions were right; I think it was the first year of his living in that house that I told Mr. Wolcott of this promise; it was a few minutes before she came that I told Mr. Wolcott of this promise again, the last time before going to Luray; I claimed to have seen her and heard her make this promise, just before this picture was taken; the other photograph was taken on the same occasion that this one was taken; I claimed at that time to see that spirit also; picture, P1, is the picture; I knew Mr. Little before he took these pictures; he resided here part of the time, three or four months; he had held meetings at our house; I loaned W. B. Little, the spirit photographer, some money to start a sleight-of-hand show, which traveled around the country; my husband, W. H. Orr, was hired to him as an agent, to help operate the show; I also loaned money to the joint partnership, Little & Potter."

P2, spoken of by Mrs. Orr, is a photograph of herself and Mr. Wolcott, between and behind whom is the alleged spirit picture of Mrs. Wolcott.

In his better days, at least, Mr. Wolcott was a shrewd, intelligent business man, and he purchased and sold many pieces of property during the last few years of his life; and there is no evidence tending to show he was imposed upon or overreached in these transactions. There is considerable evidence bearing on the question of insanity, but as we do not base our ruling thereon, reference thereto is omitted.

The evidence is abundant that Mrs. Orr is a woman of immoral character; her general reputation for chastity is exceedingly bad. R. Wilsey had frequent talks with her

about chastity. She offered to procure females for improper purposes. Wilsey talked with Wolcott about her character; but he declared she was as pure as any woman living. Wilsey offered to take Orr into partnership if Mrs. Orr would furnish the security; the subject was discussed at a seance at Wolcott's, and she offered to give a mortgage on property that stood in Wolcott's name, to which he assented.

Mrs. Orr told Julia McCormick that Wolcott loved her as well as any man could love a woman; that he gave her every thing she asked for or wanted. Mrs. Orr tried to get Kate Mallory to go to St. Louis and live with her husband as his wife. That Mrs. Orr occupied the same bed with Mr. Wolcott is shown by the testimony of several witnesses. She told the plaintiff Leighton that "she was closer to Wolcott than anybody else, and that she could have got more if she had urged it; but Mr. Wolcott said it might end in litigation if he gave her so much. That she did not get it for herself, but for the spiritual cause; and that she had intended to have got a divorce from Orr and marry Wolcott, and they intended to go to California and open a spirit gallery, but Orr was too slow."

Previous to his acquaintance with Mrs. Orr, Mr. Wolcott was received as an honored member in good society; but after that he lost caste; his relatives became estranged from him. His sister remonstrated with him, but it produced no change, and for some time previous to his death he had but little communication with his children; nor did he go into society. On all occasions he professed to believe Mrs. Orr to be pure and chaste. His property, at his death, was of the value of about $48,000, incumbered or mortgaged to the amount of $5,000 or $6,000, besides a yearly charge of $1,000 to his divorced wife.

We have referred sufficiently to the testimony, although necessarily but to a limited portion thereof.

The bad character of Mrs. Orr, and her adulterous intercourse with Wolcott, are abundantly shown, and she does not pretend to break the force of this evidence in her testimony. Living with her thus, Wolcott professed to believe her pure and chaste, he at the same time knowing she had a husband

living; at the same time he was receiving messages from his deceased wife, whom he greatly loved when living and revered her memory when dead, communicated to and through this woman. One of two things must be true: either that Wolcott was deceived as to the true character of Mrs. Orr, and this seems hardly possible, or she had obtained a very great influence over him. They lived in unlawful, but close and confidential relations for years, and under these circumstances, a few days before his death, the deeds were executed.

Whatever influence Mrs. Orr had over Wolcott, or however intimate and confidential their relations were, she obtained such influence by unlawful means, by ministering to his passions, by adulterous intercouse; their mode and relations in life were disgraceful. Influence obtained by the use of lawful means by a wife or child is eminently right and proper, if exercised with proper and honest motives. But the influence obtained by the use of unlawful means, immoral and indecent conduct, is undue influence, and no one should be permitted to derive benefit or advantage therefrom. *Dean v. Negley*, 41 Penn. St., 312; *Kissinger v. Kissinger*, 37 Ind., 341.

*[margin note: 5. ——: ——: what constitutes.]*

The unlawful relations existing between these parties—the influence the defendant must have obtained—the confidential relations that must have existed between them—the confidence necessarily reposed—may be well likened to that existing between friend and adviser, physician and patient, or many other relations in life that beget confidence. It matters not what the relation is, if confidence is reposed and influence obtained. Transactions based thereon or obtained thereby will be jealously watched and guarded by courts of equity, and set aside unless the beneficiary shows the *bona fides* of such transaction. 1 Kerr on Fraud and Mistake, 150–1–2 and 183. In *Bayless v. Williams*, 6 Coldwater, 442, this doctrine was held applicable to a contract or conveyance of real estate where friendship and gratuitous service performed for the plaintiff by the defendant was the only confidential relation that existed between them.

*[margin note: 6. ——: ——: burden of proof.]*

In *Lyon v. Home*, 6 Equity Cases (Law Reports), 655, a

case in principle much like this, it was held the burden was on the defendant to support the deeds or gifts, and that he should satisfy the court they had not been obtained by reason of confidence reposed or undue influence.

The defendant in that action was somewhat celebrated as a spritualist. The plaintiff sought him and thrust her gifts upon him, in consequence however to directions received, as she supposed, through the defendant from her deceased husband. It is true nothing of that kind is shown in the case at bar, but the legal principle announced in the case cited is not placed on that ground. Nor was there in that case as in this, any illegal or immoral relations existing between the parties. The decision is placed on the ground that owing to the confidential relation existing between the parties, and the influence thereby engendered, the onus or burden of supporting the deeds or gifts was on the defendant.

The same principle, applied, however, to the relation of attorney and client, was recognized by this court in *Ryan v. Ashton*, 42 Iowa, 365, where it was held that the contract sought to be enforced being presumptively fraudulent, the burden was cast on the plaintiff to show facts and circumstances surrounding the transaction sufficient to remove such presumption.

One of the deeds in question in this case was executed November 18, 1873, the other on the 21st of the same month, being the same day that Dr. Carpenter made his first visit. The first deed was recorded November 20, and the last on the 25th. According to the testimony of Dr. Collins, Wolcott had been quite sick for some days preceding the execution of the first deed, and we know his condition on the 21st when Dr. Carpenter visited him. He died on the 27th, or six days after Dr. Carpenter first saw him.

Mr. Munn testifies that he is a notary public engaged in banking; the last time he saw Mr. Wolcott in the bank he handed him a description of some property and requested him to prepare a deed, and come over and take an acknowledgement. Another deed was drawn by Mr. Munn, both being drawn as Wolcott directed; he stated the consideration was

one dollar and friendship; the grantee was Mrs. Orr, and the deeds conveyed the property in controversy; he acknowledged them in his office before Mr. Munn; Mrs. Orr was present when one was acknowledged; Mr. Wolcott was sick, and Mr. Munn does not recollect that Mrs. Orr said anything about the deeds. Mr. Munn had known Wolcott for some years, and noticed no difference in his mental condition from what it had been, and he had always regarded Wolcott as having first rate business capacity; Mr. Munn states that so far as he knew Wolcott was sober at the time he gave directions about the deeds, and when the acknowledgment was taken he observed nothing wrong except that Wolcott was sick; this constitutes *all* the evidence in relation to the execution of the deeds. Mrs. Orr in her testimony does not refer to the transaction except to say, "I never said anything to Wolcott about being able to take spirit pictures, I never induced him or said anything to him to induce him to give money or property for *that purpose.*" It will be readily seen she does not negative the thought that she induced or said anything to Wolcott, that may have influenced him to make the deeds to her for her own uses and purposes. Nor does she pretend to explain the circumstances under which the deeds were executed. The burden being on her, a full and free disclosure of all the facts and circumstances was incumbent on her. If the transaction was fair, and the deeds made by Wolcott freely and without undue influence, she could have readily so testified. But she does not see proper to make any disclosure whatever, and rests her case on the bare fact that the deeds were executed and have been recorded. It is evident from what she said to Mr. Leighton, the subject had been discussed between her and Wolcott, but she proffers no explanation. There is no proof the deeds were ever delivered; it is true it is to be presumed they were, and if they were something must have been said by Mr. Wolcott at the time; whatever this was should have been disclosed; was she importuning Wolcott for more, as her remark to Leighton implies, and the deeds executed as a compromise? The remark that she could have got more if she had urged it, but that Wolcott thought it might lead to liti-

gation is very significant, and should have been explained. Wolcott had a right to do with his property as he pleased, and if the transaction was honest, fair and legitimate, why should litigation be feared. The relations existing between these parties had been abnormal and peculiar for years, and Mrs. Orr could in her testimony have explained, if their relations were legitimate and proper, many things which unexplained must and should operate against the validity of the deeds.

While Mr. Wolcott may not have been insane, yet his peculiar condition when seen by Drs. Carpenter and Collins, indicates quite clearly that his mind could not have possessed its usual clearness and vigor. It must have become somewhat warped and, therefore, what he said and did (when he delivered the deeds, if he did so,) was important. The fact that he devised the same property to Mrs. Orr in his will is an indication that he either never delivered the deeds or had forgotten the transaction. We are of the opinion that Mrs. Orr has not made or proved such a case as is requisite to support the deeds.

It is urged that Wolcott, if living, could not set aside the deeds if they were executed in consideration of the unlawful 7. ——: ——: cohabitation, and that the infant plaintiffs can unlawful co-habitation. have no better rights in this respect than he would have had. We are by no means sure the latter part of this proposition is correct, but there is no proof showing that Wolcott did execute the deeds by reason of such unlawful cohabitation. Such cohabitation, combined with the intimate relations between the parties, may and no doubt did give Mrs. Orr great influence over him. Besides this, however, if the deeds were executed and delivered in consideration of such cohabitation, Mrs. Orr fails to so say in her testimony. She alone could have told what the actual consideration was; had she done so, we should not have been compelled to draw inferences from facts she might have explained. The petition may have been obnoxious to a motion for a more specific statement, but we are clearly of the opinion, in the absence of such motion, that it was sufficient to justify the admission of all the testimony before us. The objection urged by

counsel in this respect is made for the first time in this court, as we must presume when the abstract fails to show the objection was made in the court below. It therefore comes too late.

There is no pretense that Mrs. Orr paid anything for the property conveyed, but it is urged that a sufficient consideration is shown by the fact that Mrs. Orr for several years took care of Wolcott and kept house for him when he had been deserted by his friends and relatives. The testimony, however, satisfies us that Wolcott took care of and provided a home and support for Mrs. Orr and her family for years. If Mrs. Orr furnished any consideration for the deeds it was of an unlawful and immoral character, which public policy requires should not be permitted or encouraged.

We have been somewhat embarrassed in stating the testimony, because there are two abstracts before us, one prepared by the appellant and the other by the appellee. In the absence of any denial of or correction of the latter abstract, we, whenever there has been a conflict, have relied on that of the appellee, as is the rule and established practice of the court.

For the reasons above stated the judgment of the court below must be affirmed, without determining the question as to the insanity of Wolcott which has been so ably and exhaustively argued by counsel.

AFFIRMED.