# Shipman *v.* Furniss.

*Bill in Equity to have Deed to Lands declared Void as obtained by Fraud and Undue Influence, and to have it Cancelled as a Cloud upon the Title.*

1. *Deed obtained by undue influence voidable merely.*—Where the execution of a deed is procured by undue influence, the deed is voidable merely, and not absolutely void.

2. *Cloud upon the title ; jurisdiction of court of equity to remove.*—While it is true that the jurisdiction of a court of equity can not be invoked, when the sole ground of equitable interference is the removal of a cloud from the title, unless the complainant is at the time in possession, the rule is different, when other distinct grounds of jurisdiction are averred. In such case, the court, having assumed jurisdiction for one purpose, will retain it, that the whole litigation may be settled, and complete justice be done between the parties.

3. *Same.*—Hence, a court of equity will entertain a bill filed to have a deed cancelled, the execution of which is shown by proper averments to have been procured by fraud and undue influence, notwithstanding the fact, that the complainant is out of possession.

4. *When averments of bill not repugnant.*—Where in a bill filed to have a deed to lands declared void as obtained by fraud and undue influence, and cancelled as a cloud upon the title, it is shown, by appropriate averments, that the grantor's signature was obtained by fraud and undue influence, and that the deed was recorded, and the grantee was in possession, claiming under it, there is no objectionable repugnancy in averments touching the delivery of the deed, one of which, based on information and belief, is, that the deed was never in fact delivered, and was for this reason inoperative ; and the other is, that if complainant is mistaken in

[Shipman v. Furniss.]

this, and the deed was delivered, its delivery was procured by the fraud and undue influence, which induced the grantor to sign it.

5. *Parties bearing towards each other confidential relations; dealings between.*—The rule that dealings between parties bearing towards each other confidential relations will be jealously watched by the courts, is not confined to relations strictly fiduciary, but extends to " all the variety of relations in which dominion may be exercised by one person over another."

6. *Undue influence; when inferred.*—While undue influence is a species of constructive fraud which the courts will not undertake to define by any fixed principles, its exercise may be inferred in all cases of confidential, or *quasi* confidential relations, where the power of the person receiving a gift, or other like benefit, has been so exercised over the mind of the donor as, by improper acts or circumvention, to have induced him to confer the benefaction contrary to his deliberate judgment, reason and discretion.

7. *Same; burden of proof.*—Where one, living in illicit sexual relations with another, gives to such person property of considerable value, especially where the donor, in making the gift, excludes natural objects of his bounty, the transaction will be viewed by a court of equity with such suspicion, as to cast on the donee the burden of proving that the donation was the result of free volition, and was not superinduced by fraud or undue influence.

8. *Same; when deed obtained by.*—Where a young man, addicted to strong drink and lewd dissipation, the excessive indulgence in which had impaired both his mind and body, executed a deed of gift conveying a large and valuable tract of land, constituting substantially all his property, to a common prostitute, who had and exercised over him a strong influence, and with whom he had been living for some time as his wife under a marriage ceremony which was void by reason of her prior marriage with another who was still living, the grantor thereby preferring her to the exclusion of his own blood relations, the transaction not only challenges the duty of the courts to watchfulness and jealousy in scanning the circumstances under which the deed was executed, but is persuasive to impress the judicial mind with a conviction, that the will and judgment of the grantor were brought under illegitimate constraint in producing so unnatural a result.

9. *Same.*—In such case, if the donor executed the deed with an honest belief that his marriage with the donee was lawful and valid, he executed it under a false and fraudulent hypothesis, and, for this reason, the deed could be avoided, as having been procured by artifice, circumvention and fraud.

10. *Deed to grantor's paramour; when void.*—And if he was aware of the illegality of his marriage, the deed must be construed, under all the facts of the case, to have been made in contemplation of the continuance of their adulterous intercourse, thus presenting the case of an executed contract, founded upon an illegal consideration, against which a court of equity will grant relief, when, by undue influence, the donee has procured its execution.

APPEAL from Dallas Chancery Court.

Heard before Hon. CHARLES TURNER.

The facts are stated in the opinion.

BROOKS & ROY, with whom were REID & MAY, for appellants. (1). The jurisdiction of the court in this case can not be maintained on the ground of removing a cloud from the title, because it is averred, proven, and admitted that the com-

[Shipman v. Furniss.]

plainant was not in possession.—*Arnett v. Bailey*, 60 Ala. 438; *Jones v. De Graffenreid, Ib*. 151. (2). There is no such averment of fraud as will confer jurisdiction. The fraud, duress, conspiracy and undue influence charged, are alleged to have procured the *signing* of a deed, which the bill itself, in substance and effect, avers was *never delivered or executed,* and *never became a deed*. If execution of the deed had been averred, the bill would have shown a "mere fraud" cognizable at law. But its execution and delivery being denied, the bill shows a mere *attempt* at fraud, never consummated, and this will not support the jurisdiction. (3). But it being shown by the evidence that the deed was delivered, it is insisted that the complainant is entitled to relief on what is called the "alternative" averment of the bill touching the delivery of the deed. This averment is, in substance, that, if the complainant is mistaken, and the deed was *delivered,* then Mathews was induced to deliver the deed by fraud, etc. This is no averment of any fact or thing whatever. It certainly does not show that the deed was executed; it neither denies nor admits its execution, but insists that *if* executed, it is void for fraud, etc. It is a cardinal rule in chancery pleading, that the facts upon which the complainant relies for relief "must appear, *not by inference,* but by *direct* and *unambiguous* averment."—*Duckworth v. Duckworth,* 35 Ala. 70; 29 Ala. 367. This so-called averment seeks to assail the validity of an instrument or deed, which it does not show has any existence, and which the bill in the former part thereof distinctly avers was never delivered. But a decree granting relief must be *founded on the facts stated in the bill.*—*Charles v. Du Bose,* 29 Ala. 367; *Rives, Battle & Co. v. Walthall,* 38 Ala. 332; *Colton v. Ross,* 2 Paige, 396; 1 Barbour Ch. R. 329; *McKinley v. Irwin,* 13 Ala. 681–95; *Alexander v. Taylor,* 56 Ala. 63; 34 Ala. 626; 40 Ala. 587; 41 Ala. 693; 56 Ala. 584. Hence, no relief can be predicated upon the existence or execution of the deed, upon the ground that it is fraudulent, when it does not appear by direct averment, that the deed was delivered, much less when its delivery is expressly and distinctly denied. (4). The rule is that alternative averments are insufficient, unless *each averment* presents a case entitling the complainant to the relief sought.—*David v. Shepard,* 40 Ala. 587; 34 Ala. 626; 8 Ala. 920. (5). On a decree *pro confesso,* the court would not know what decree to render. The relief would not be the same, but repugnant. (6). "The influence which the law repudiates is *undue* influence; denominated undue, because it is *unrighteous, illegal, and designed to perpetrate a wrong*. The undue influence exerted to procure the execution of a deed or will must amount to *fraud* or *coercion*. The grantor must be overreached

and deceived by some false representation or stratagem, or by coercion, physical or moral."—*Davis v. Culver*, 13 How. (N. Y.) 62; 4 U. S. Dig. p. 582, § 2553. The influence which is the result of solicitation, argument, persuasion, attachment or affection, is not undue influence. To be undue it must prevent the exercise of discretion, destroy free agency, amount to moral coercion, and constrain its subject *to do what is against his will.*—*Gilbert v. Gilbert*, 22 Ala. 532; *Hall v. Hall*, 38 Ala. 134; *Taylor v. Kelley*, 31 Ala. 70; *Leverett v. Carlisle*, 19 Ala. 80; *Pool v. Pool*, 33 Ala. 145; *Leeper v. Taylor*, 47 Ala. 222; *Bailey v. Litten*, 52 Ala. 282. And the free agency must be destroyed at the time the instrument is executed.—14 U. S. Dig. 293, § 1092; 43 Penn. 46; 20 Penn. 329. The influence of affection and attachment, or the desire to gratify another, instead of being against the validity of the instrument, "would be very strong ground in favor of a testamentary act.—*Taylor v. Kelley*, 31 Ala. 70. On the question of undue influence, see also *Leverett's Heirs v. Carlisle*, 19 Ala. 80; *Clarke v. Sawyer*, 3 Sanf. Ch. 352; *Gardner v. Gardner*, 22 Wend. 526, 538–42; *Farr v. Thompson*, Cheves (S. C.), 37; 14 U. S. Dig. 294, § 1095. (7). The bill charges fraud and undue influence. "Fraud and undue influence are not presumed. Whoever, in a court of equity, bases a right to the recission or cancellation of a contract on allegations of either or both, must *distinctly allege*, and *clearly prove* the fraud or undue influence."—*Bailey v. Litten*, 52 Ala. 284. See also Kerr on Fraud and Mistake, 190–1; 1 Greenl. on Ev. § 74; *Gardner v. Gardner*, 22 Wend. 540; *Tompkins v. Nichols*, 53 Ala. 200; *Pool's Heirs v. Pool's Ex'r*, 33 Ala. 145. This is the general rule. The exceptions are where the parties occupy *fiduciary relations*, as principal and agent, trustee and *cestui que trust* and the like; examples of which are, *Waddell v. Lanier*, 62 Ala. 348; *Todd v. Grove*, 33 Md. 188. But it is contended the exception extends to parties, between whom exist "illegal sexual relations," not because that is a "fiduciary" relation, but because the relation itself is illegal; and we are cited to Cooley on Torts, p. 515; Bigelow on Frauds, p. 271. But these authorities refer to the decision in *Dean v. Negley*, 41 Penn. St. 312; and the court in that case expressly and directly refused to hold that such an illegal relation would raise any "presumption in law," which would shift the *onus*. See also *Gracie v. Potter*, 58 Ala. 307. The *onus* is not therefore shifted in this case. (8). "Past seduction of, or cohabitation with a female seems to afford a sufficient consideration for an express promise to pay money to her, or for her support, there being a *moral obligation* to redress as far as possible the injury inflicted.—Chitty on Contracts, p. 49; *Shenk v. Mingle*, 13 Serg. & Rawle, 29; *Gibson v. Dickie*,

[Shipman v. Furniss.]

3 M. & Selw. 463; *Binnington v. Wallis*, 4 B. & Adol. 650. And this doctrine was maintained and enforced in a case where "the plaintiff was a *common prostitute* when the defendant first became acquainted with her."—Chitty on Con. p. 661; *Friend v. Harrison*, 2 C. & P. p. 584. See also on this point: Story on Con. p. 541, and authorities cited; Kerr on Fraud & Mistake, 194; *Hargrove v. Everard*, 6 Ir. Ch. 278; 1 Story's Eq. Jur. § 182 A; *Giles v. Giles*, 1 Keen, 685; *Farr v. Thompson*, 1 Cheeves (S. C.), 37; 14 U. S. Dig. p. 294; § 1085. We do not mean to say that, if the contract were *executory* and founded on the consideration of *future* illicit intercourse, the courts would enforce it. On the contrary, when the consideration is illegal, the courts will stand off and refuse to help either party; and if the contract be *executed*, the courts will refuse to set it aside, on the maxim, *In pari delicto potior est conditio possidentis.*—2 Kent's Com. m. p. 467; 1 Brick. Dig. 377, § 32; *Wood v. Duncan*, 9 Port. 227; *Walker v. Gregory*, 36 Ala. 184.

PETTUS, DAWSON & TILLMAN, *contra.*—(1). It is admitted that the rule in this State is, that a party *out* of possession can not file a bill *merely to remove a cloud* from his title, without stating *some ground of equitable jurisdiction, in addition to the existence of the cloud.* But it is well settled that where the owner is *in possession*, that fact and the existence of a cloud on the title, *without any other fact*, gives a court of equity jurisdiction to remove the cloud.—*Burt v. Cassety*, 12 Ala. 734; *Rea v. Longstreet*, 54 Ala. 294, and cases cited. (2). It is also well settled, that when a bill contains other and independent grounds of equity jurisdiction, "the court will settle the litigation and do complete justice, without remitting the parties to a court of law, though *as to some features of the case*, the remedy at law is adequate."—*Lockett v. Hurt*, 57 Ala. 198; 1 Story's Eq. Jur. §§ 228-9; *Daniel v. Stewart*, 55 Ala. 278. (3). In this case the equity of the bill does not rest alone on the averment, that the deed sought to be cancelled, is a cloud upon the title; but on the additional averment that the *deed was procured by fraud and undue influence*, a distinct and independent ground of jurisdiction.—1 Story's Eq Jur. § 184; *Chesterfield v. Janssen*, 2 Ves. Sr. 125; *Chambers v. Crook*, 42 Ala. 171; *Boney v. Hollingsworth*, 23 Ala. 690; *Kennedy v. Kennedy*, 2 Ala. 571; *Whelan v. Whelan*, 3 Cowen, 537; 3 Lead. Cases in Eq. 124. (4). If the deed had never been in fact delivered, it constituted a cloud upon complainant's title, embarassing alienation, and should be cancelled. It is shown to be of record in the hands of the defendant, Shipman, who was in possession of the lands claiming title thereunder. In such a case a court of equity should interfere, it being shown that the

[Shipman v. Furniss.]

grantor's signature was obtained thereto by fraud and undue influence.—*Bunce v. Gallagher*, 5 Blatch. 481; *Brewton v. Smith*, 28 Ga. 442. The contrary doctine was announced in *Pratt v. Pond*, 5 Allen, 59; but that case was expressly decided on a statute of Massachusetts. A deed *signed* by an insane person will be cancelled in equity, on proper application, although such person could not *execute* or *deliver* the deed.—1 Stc y's Eq. Jur. §§ 228-9. See also *Donelson v. Posey*, 13 Ala., on pages 767-8. Whether, then, the deed was *delivered or not*, the relief to which the complainant is entitled is the same; and hence, there is no objectionable repugnancy in the alternative averments of the bill touching the execution of the deed. (5). The deed recites as its consideration the love and affection which the grantor bore towards "*his wife.*" This recital is shown to be false. The deed is thus impeached for its own falsehood, and can not, therefore, stand by its own force.— *Watt v. Grove*, 2 Sch. & Lef. m. p. 501; *Gibson v. Russell*, 21 Eng. Ch. Rep., note on pp. 120-1-2; *Broderick v. Broderick*, 1 Pere Wms. m. p. 239; *Dunnage v. White*, 1 Swans. p. 137; *Kennell v. Abbott*, 4 Ves. Jr. 802. (6). The facts of this case show a clear case of fraud and undue influence; and the deed should be cancelled.—Hill on Trustees, pp. 213-14; 1 Story's Eq. Jur. § 234 *et seq.; Harding v. Wheaton*, 2 Mas. 378; *Harding v. Handy*, 11 Wheat. 125; *Allore v. Jewell*, 4 Otto, 506; *Sears v. Shafer*, 6 N Y. 268; *Huguenin v. Basely*, 3 Lead. Cases in Eq. p. 94 *et seq.* and authorities cited. (7). It being shown that the woman had a strong, controlling influence over Mathews, the courts will scrutinize the transaction as closely and jealously as they would transactions between persons occupying fiduciary relations towards each other.—*Gibson v. Russell*, 21 Eng. Ch. Rep. p. 120, note. (8). The influence which the woman had over Mathews is by law *presumed* to have been undue influence, from their illicit relation to each other.—*Leighton v. Orr*, 44 Iowa, 689; *Dean v. Negley*, 41 Penn. St. 312; *Kessinger, v. Kessinger*, 37 Ind. 341; *Bevins v. Jarnigan*, 59 Tenn. 282; Cooley on Torts, p. 515; Bigelow on Fraud, p. 271.

SOMERVILLE, J.—The bill in this cause was filed by the appellee, as contingent remainderman, under the will of her grandfather, Joel E. Mathews, Sr., deceased, for the purpose of setting aside a deed of gift to certain lands executed by Joel E. Mathews, Jr., the son of Joel E. Mathews, Sr., to one Kenney, as trustee for Mary A. Shipman, *alias* Mathews, on the alleged ground of fraud and undue influence, averred to have been used in procuring its execution. It is sought to have the deed cancelled as a cloud on the appellee's title.

The salient facts of the case may be succinctly stated as follows:

lows: Mary A. Shipman, formerly Mary Kenney, was lawfully
married to John A. Shipman, in December, 1865, in the State
of Georgia.   After living with him for a few years, she aban-
doned him clandestinely under circumstances indicating both'
her lack of chastity and honesty, and soon took refuge in a
house of prostitution.   She is shown to have been a woman of
personal beauty, attractive manners, and of more than ordinary
intelligence, shrewdness and will power, and seems to have un-
remittingly plied her vocation as a prostitute up to the transac-
tions detailed in the bill.

While in the city of Selma, Alabama, in a house of ill-fame,
she formed the acquaintance of Joel E. Mathews, Jr., the grantor
in said conveyance, who is shown to have been a young man of
most reputable relationship, and of considerable wealth, but a
slave to drunken, immoral, and dissolute habits.   An illicit inti-
macy sprang up between the two, and all the facts evince that
Mathews was possessed of an inordinate infatuation for the
woman, and that he was daily brought more and more under
the domination of the unlawful influence.   Believing her to be a
single woman, he followed her to Georgia, and went through
the formalities of a clandestine marriage with her, in the town
of Marietta, on the 11th day of April, 1876.   They afterwards
returned to Selma, and openly continued the adulterous inti-
macy, until the date of Mathews' death, in January, 1878, he
publicly claiming her as his lawful wife, and taking her to reside
with him at his plantation near Selma, in the county of Dallas,
the premises conveyed to her in the deed of gift, and which are
here in controversy.

This conveyance was executed on December, 19th, 1876, and
the consideration of it is recited to be natural love and affection
for the grantee as *his wife*, and the nominal sum of one dollar.
It swept away substantially all of the grantor's property, leav-
ing him nothing, and was withheld from the record until the
death of the grantor, after which it was registered.   Mrs. Ship-
man's own attorney drafted the instrument, and she accompa-
nied Mathews to the city, and also to the attorney's office, both
when instructions were given for its preparation, and at the
time when it was signed.   The evidence' fails to show that any
compulsion was used, tending to overcome the free agency of
Mathews at the immediate time the deed was signed, but his
habits of frequent and excessive intoxication, and sexual indul-
gence seem to have impaired both his mental and physical con-
dition previous to this time.   Facts had been brought to his
knowledge, prior to this period, which probably caused him to
seriously doubt the legality of his marriage, but he seems to
have continued to act upon the theory of its validity, and during
the following year allowed the reputed wife to institute pro-
36

ceedings in a court of chancery to have herself declared a "free dealer," under the provisions of the statute authorizing *married women* to be made free dealers.

The evidence further discloses, that Mrs. Shipman, both before and after the pretended marriage with Mathews, was continuously and openly on terms of intimate and illicit relationship with one William A. Owen, who is proved to have been a man of dissolute habits, quarrelsome nature, and of overbearing and domineering disposition. He seems to have been the constant associate of both Mrs. Shipman and of Mathews, and by his force of character and harsh treatment, to have acquired great influence with the latter. All the circumstances of the case are persuasive to show further, that he was at all times a ready and pliant instrument in her .hands. Both Owen and the woman are shown to have encouraged Mathews in his habit of drunkenness, until by excessive indulgence in strong drink he was soon brought to his grave.

The testimony of the witnesses is given in great detail, the history of the alleged transaction covering more than nine hundred pages of a voluminous record, but the facts need not be further discussed for the purposes of this decision.

After stating the circumstances under which the deed was signed, the complainant avers, on information and belief, in substance, that the deed never was in fact delivered, and was, for this reason, inoperative to convey the land; but that, if she is mistaken in this, and the deed was delivered, it was not delivered until several months after it was signed, and that its delivery was procured by the fraud and undue influence by which Joel E. Mathews, Jr., was induced to sign it. It is also averred that the defendant, Mary A. Shipman, was in possession of the lands, holding them and claiming title thereto under said deed. The defendant demurred to the bill on the ground, that the complainant had an adequate and complete remedy at law. At the hearing a motion was also made to dismiss the bill for want of equity. The chancellor overruled both the demurrer and the motion to dismiss, and caused a decree to be entered granting the complainant the relief prayed, basing his decree upon the conclusion reached by him, that the facts charged and proved established a case of undue influence.

The demurrer was, in our opinion, properly overruled. If the execution of the deed was procured by undue influence, it is clear that it would be voidable, and not absolutely void. In such case, she could not maintain an action of ejectment for the recovery of the lands; and being without remedy at law, she may, under the averments in the bill in this cause, come into a court of equity to have the deed cancelled as a cloud on her title, notwithstanding the fact that she is out of possession. It

is true, that the jurisdiction of a court of equity can not be invoked, when the sole ground of equitable interference is the removal of a cloud from the title, unless the complainant is, at the time, in possession.—*Arnett v. Bailey*, 60 Ala. 435. But the rule is different when other distinct grounds of jurisdiction are averred. In such case, a court of equity, having assumed jurisdiction for any one purpose, will retain it, that the whole litigation may be settled, and complete justice be done between the parties.—1 Story's Eq. Jur. §§ 228–9 ; *Lockett v. Hurt*, 57 Ala 198; *Ray v. Womble*, 56 Ala. 32.

There is no objectionable repugnancy in the two aspects presented by the bill, touching the execution and delivery of the deed. In either aspect, whether it was in fact delivered, or whether it was merely signed and not. delivered, but surreptiously obtained from the papers of Joel E. Mathews, Jr., after his death, or from him while living—the deed having been recorded, and being in the hands of the defendant, Mary A. Shipman, who was in possession, claiming title under it—it would be a cloud upon complainant's title; and in either aspect, if the signature or delivery was procured by undue influence exercised by the defendant over the grantor, the relief to which the complainant would be entitled, is precisely the same.—*Micou v. Ashurst*, 55 Ala. 607 ; *Rapier v. Gulf City Paper Co.*, *ante*, p. 476.

The majority of the court, however, without committing themselves to all that is said above, hold, that the statements of the bill do not bring this case within the principle declared in cases of alternative or disjunctive averments. According to their opinion, the bill contains two distinct, independent grounds on which the claim to relief is based ; and that if either ground is sufficient, its force is not impaired by the fact that it is joined cumulatively with another alleged ground, which, of itself, will not maintain the equity of the bill. They concur in the conclusion reached, that the demurrer to the bill, and the motion to dismiss for want of equity were properly overruled.

The main question in this case, and upon which its decision must depend, is the doctrine of *undue influence* as affected by *unlawful* and illicit relations existing between the donor and donee at the time of executing the deed of gift in question. The jurisdiction exercised by courts of chancery in setting aside voluntary donations or other contracts, in the case of parties bearing confidential relations towards each other, is a familiar and salutary one, and is based upon well recognized principles of a sound public policy.—3 Lead. Cases, Eq. (H. & W.), 111. And while in *Dent v. Bennett*, 4 Myl. & Cr. 269, Lord COTTENHAM declined to make any enumeration of the particular class of persons whose mutual dealings in this regard

ought to be watched with jealousy by the courts, it seems now settled that the rule is not confined to relations strictly fiduciary, but applies to " all the variety of relations in which dominion may be exercised by one person over another."—*Huguenin v.. Basley*, 14 Vesey, 273, S. C. Lead. Cases, Eq., (H. & W.), p. 111, (462, 486); *Bayliss v. Williams*, 6 Cold. (Tenn.) 440; Kerr on Fraud and Mistake, 192–193; Bigelow on Fraud, p. 279, § 21.

It has been frequently, and, as we think, most properly, exercised in the case of illicit relationships existing between donors and donees, and even testators and devisees, especially where they originated in an abortive attempt at a lawful marriage. For such a relationship, especially if continued under the outward conventionalities of lawful marriage, would manifestly be of a confidential nature.

It is true that, as between a lawful husband and wife, the better opinion is, that a liberal donation by the one to the other will not warrant of itself a presumption of undue influence,. unless there is something suspicious in the circumstances, or the nature or magnitude of the gift is such that it ought not to have been accepted.—*Small v. Small*, 4 Me. 220; 3 Lead. Cas., Eq. 144. And it may be further admitted, that, in the case of benefits received under *wills*, the bare proof of an unlawful cohabitation between the testator and a devisee would not alone ordinarily raise a presumption of undue influence, sufficient to avoid the will.—*Wainwright's Appeal*, 89 Penn. St. 220. In *Farr v. Thompson*, Cheve's Rep. (S. C.) 37, the same rule was announced as applicable to a case where a testator bequeathed all of his property to a kept mistress, to the exclusion of his nephew and other relations; but the decision is criticised and its authority doubted by the annotator of the Leading Cases in Equity, 3d vol., p. 146.

There can, however, be no question about the fact that the same rule does not apply with equal force to benefactions received under *wills* and *deeds of gift*, but that there exists a well grounded distinction between the two classes of instruments. Stronger proof is, and manifestly should be required to raise a presumption of undue influence in the case of a will,. than of a deed or contract, for the former, unlike the latter, can never take effect until the giver is dead, and, therefore, in a condition utterly incapacitating his further enjoyment or use of the subject of his testamentary disposition. Improper influence may be often inferred to have operated in producing *gifts*, where the same evidence would fail to authorize such an inference in case of a legacy or devise. Lord ELDON declared in *Gibson v. Jeyes*, 6 Ves. 266, that " whenever a person obtains by voluntary donation a large pecuniary benefit from another,

[Shipman v. Furniss.]

the burden of proving that the transaction is righteous falls on the person taking the benefit," and it has always been held that the improvidence of the transaction, generally in the case of both gifts and contracts, is a cogent circumstance showing fraud or undue influence.—*Harvey v. Mount*, 8 Beav. 439 ; Cooley on Torts, 515–16 ; *Clarke v. Sawyer*, 3 Sandford Ch. 351, 425 ; *Jennings v. McConnel*, 17 Ill. 148 ; 3 Lead. Eq. Cases, 141, 145 : *Daniel v. Hill*, 52 Ala. 430.

What constitutes undue influence is a question depending upon the circumstances of each particular case. It is a species of constructive fraud which the courts will not undertake to define by any fixed principles, lest the very definition itself furnish a finger-board pointing out the path by which it may be evaded. But it is evident that its exercise may be inferred in all cases of confidential, or *quasi* confidential relationship, where the power of the person receiving a gift or other like benefit, has been so exerted upon the mind· of the donor, as, by improper arts or circumvention, to have induced him to confer the benefaction contrary to his deliberate· judgment, reason and discretion.—Bigelow on Fraud, 283 ; 1 Redf. on Wills, 530.

The following principle, we think, is sound both in law and morals, and, though a departure from the former rule, is sustained by the more modern authorities: When one, living in *illicit sexual relations* with another, makes a *large gift* of his property to the latter, especially in cases where the donor *excludes natural objects of his bounty*, the transaction will be viewed with such suspicion by a court of equity, *as to cast on the donee the burden of proving that the donation was the result of free volition, and was not superinduced by fraud or undue influence.* How much further the principle may be extended, if any, it is neither our province nor purpose now to consider.

This doctrine is fully sustained by Judge Cooley in his work on Torts, and receives the approval of other eminent jurists and text writers..—Cooley on Torts, p. 515 ; Bigelow on Fraud, p. 271 ; 1 Redf. on Wills, p. 532–4 ; 3 Lead. Cases, Eq. 146.

The Supreme Court of Iowa also gave it an unqualified approval in *Leighton v. Orr*, 44 Iowa, 679, and again re-affirmed it in *Hanna v. Wilcox*, 53 Iowa, 547. These cases hold the doctrine that influence obtained· by a woman over a man, with whom she is living in unlawful cohabitation, is *undue influence*, and where he makes a conveyance of valuable property to her during its continuance, on the recital of a merely good consideration, a court of equity will intervene to set it aside on the ground of having been procured by undue influence, in the absence of evidence showing it to be fair and free from fraud. In the latter case the court say : " The exercise of unlawful

influence will be presumed, when the parties to a deed live in adulterous relations, in the absence of proof of a lawful consideration. These rules are in accord with sound reason and legal principles. Their application will tend to restrain immorality. No paramour should be permitted to enjoy the wages of her sin, which she obtains through the generosity of her victim, stimulated by her ministry to his passions."—*Hanna v. Wilcox, supra,* 550.

In *Dean v. Negley,* 41 Penn. St. 312, the same principle was applied to a devise by a testator under a will, so far as to hold, that, upon an issue to determine the validity of a will, where it was shown by the contestants that the testator was living in open adultery with a woman to whose children he devised the bulk of his estate, these facts would afford a strong presumption of the exercise of undue influence upon the mind of the testator, and would authorize a verdict against the will. This case seems, however, not to have been followed to its full extent in the later case of *Wainwright's Appeal,* 89 Penn. St. 220.

In *Bivins v. Jarnigan,* 3 Baxt. (Tenn.) 282, the Supreme Court of Tennessee followed the doctrine announced in *Dean v. Negley, supra,* and set aside a deed of gift, executed by a man living in adulterous relations with the donee, by which he conveyed to her a large part of his property in consideration of love and affection. The court say: "We think in such case, there does arise a strong presumption that the deed was obtained by an undue influence and power the woman had obtained over him" [the donor], and for this reason the court set aside the deed.

The Supreme Court of Indiana, in *Kessinger v. Kessinger,* 37 Ind. 341, held, that an influence in procuring the execution of a will might well be considered illegitimate and undue, when exercised by a woman living on terms of illicit intimacy with the testator, which would be regarded as lawful and proper when exercised by a wife.

The principle under discussion seems to have been carried still further in a recent and well considered English case, that of *Coulson v. Allison,* 2 De Gex, Fisher and Jones' Rep. 521. Here a widower had consummated a marriage with the sister of his deceased wife, which, under existing laws, was illegal and absolutely null and void. It was represented to her as a matter of doubt, whether her marriage was valid or not, and during the illicit relationship she made a settlement upon the reputed husband of a considerable part of her estate. On bill filed to set aside the conveyance, it was held by the Lord Chancellor, that, under the facts, the *onus* was on the donee of showing that at the time the woman entered into the transaction, she was fully, fairly, and truly informed of its character, and of

VOL. LXIX.

her legal *status;* and further, that such a marriage and co-habitation was not a sufficient consideration to support the conveyance, which was executed by the woman in the capacity of wife, and purported to be a post-nuptial settlement. The court ordered the deed to be delivered up and cancelled without proof of any threats, pressure or solicitation having been brought to bear on the mind of the donor. It was said by the Lord Chancellor:

"The moving consideration of the deed was clearly the notion of a valid existing marriage. This is shown by the wording of the deed, every syllable of which proceeds upon the footing of a supposed subsisting marriage, and it is further shown by her executing it, and acknowledging it in the character of a married woman. But, supposing even both Nicholson and Ann Welbank [the donor and donee] to have been aware of the true state of the law, and to have nevertheless agreed to cohabit together, she being the mistress and not his wife, it seems to me the deed would then have been impeachable on the ground of immorality, for nothing can well be conceived more immoral than for a woman to make over the whole of her property to a man in contemplation of continuing an illicit intercourse with him for the remainder of their joint lives."

The principles above discussed apply with great force to the case under consideration. Here is a deed of gift made by a young man diseased with a consuming passion for strong drink and lewd dissipation, the excessive indulgence in which is shown to have impaired both his mind and body. It sweeps away by a stroke of his pen, all of his property, including the very roof sheltering his head. The beneficiary is a common prostitute, who is preferred to the exclusion of the donor's own blood relations. And the harsh influence of a bad and daring man—a rival paramour—is artfully made subservient to the accomplishment of her purposes. Such transactions not only challenge the duty of the courts to watchfulness and jealousy in scanning the appliances by which they have been procured, but are persuasive to impress the judicial mind with a conviction that the will, and reason, and judgment of the donor were brought under illegitimate constraint in producing so unnatural a result. The chancellor so found by his decree, and we do not feel authorized under the evidence to reverse his finding.

There is another view of this case not considered by the chancellor, which, we think, would compel an affirmance of his decree. The deed of gift, made by Joel Mathews, and which is here assailed, was executed by him either with an honest belief that his marriage was *lawful* and valid, or else that it was *unlawful* and adulterous. If the *first* supposition be true, the

deed was executed upon the false and fraudulent hypothesis that the donee was his lawful wife, and could, for this reason, be avoided as having been procured by artifice, circumvention and fraud.—*Coulson v. Allison,* 2 De. G., F. & J., Eng. Ch. 521. If the other supposition be true, the donor being aware of his illicit relationship to Mrs. · Shipman, the conveyance must be construed, under all the facts of the case, to have been made in contemplation of the *continuance* between the parties of their adulterous intercourse, and this would present the case of an executed contract upon an illegal consideration. And against such a contract a court of equity will often undertake to grant relief, where, by undue influence, the donee has procured its execution; for in such cases there is no room for the maxim: "*In pari delicto, potior est conditio defendentis.*" *Coulson v. Allison, supra.* This maxim, as has been well said, ceases to apply, where "the acts of one of the parties have their origin in the acts or influence of the other, because the wrong then rests chiefly, if not solely, on the person by whom it was contrived; and his confederate will be regarded as a mere tool or instrument for accomplishing an end which was really not his own."—3 Lead. Cases Eq. 153; *Ford v. Harrington,* 16 N. Y. 285; *Long v. Long,* 9 Md. 348.

It may be that the views announced in this case constitute a slight modification of the doctrine of undue influence as anciently held by the earliest authorities. But the instances are numerous and familiar, where the common law principles have undergone like modifications, adapting themselves, by force of their elasticity, at one time, to the exactions of a sounder reason, and, at another time, to the demands of a more exalted morality. We recall notably the law of uncommunicated threats, equitable estoppels, duress by menaces of property, and the testimony of husband and wife for and against each other. In each of these cases the law has gradually undergone a wise and most commendable mutation.

It is the duty of the courts, we think, to encourage those doctrines and currents of decisions which are supported by a sound public policy, as far as authority and reason will permit. It was the boast of Sir EDWARD COKE concerning the common law, as it before had been of CICERO regarding the Roman law, "that it was the perfection of reason." It will challenge claim to a yet higher and worthier admiration, when it becomes also the perfection of true honesty, and high christian morality.

Under the provisons of the civil law the conveyance in this case would be void, and it would be a scandal on justice, if a court of conscience, applying the principles of the common law, should permit it to stand.

The decree of the chancellor, overruling the demurrer and granting the relief prayed in the bill, is hereby affirmed.