IN RE ESTATE OF GLADYS M. LATHROP.

C. W. LEFFINGWELL, Special Administrator, et al., Appellees, v. F. N. LATHROP et al., Appellants.

**WILLS:** **Undue Influence—Illicit Relations.** Evidence reviewed, and
1   held quite insufficient to show the existence of illicit relations between a testator and a legatee,—assuming, *arguendo*, that such relations, if shown, might constitute undue influence.

**WITNESSES:** **Confidential Communications—Attorney and Client.** An
2   attorney who, in the negotiations for his prospective employment, assumes to delve into the facts of a transaction and to give legal advice thereon, is incompetent, as a witness, to testify to the matters revealed to him, even though he was not employed.

*Appeal from Jones District Court.*—F. F. DAWLEY, Judge.

JANUARY 11, 1921.

THIS is a will contest. The testatrix was Gladys M. Lathrop. The contestants are her three brothers and only heirs at law. At the close of contestants' evidence, the trial court directed a verdict sustaining the will. The contestants appeal.—*Affirmed.*

*Remley & Wheeler* and *C. E. Wheeler,* for appellants.

*B. E. Rhinehart* and *C. J. Lynch,* for appellees.

EVANS, C. J.—I. The principal beneficiary of the will was Hall. The amount of the estate was about $5,000. Small bequests were made to other legatees. The ground of the contest was that the execution of the will had been

1. WILLS: undue influence: illicit relations. brought about by the undue influence of Hall. The form of the undue influence alleged was that illicit relations existed between Hall and the decedent, and that, by means of such illicit relations, Hall had been able to overpower the free will of the decedent. The line of argument is that, the illicit relation being established, this of itself furnished sufficient evidence to go to the jury on the question of undue influence. Without assenting to the legal proposition thus relied on, we are disposed to go first to the premise of fact upon which the argument is based. Was there sufficient evidence of illicit relations to justify a jury in finding such to be the fact? Gladys M. Lathrop was the maiden name of the testatrix. She was 36 years of age, at the time of her death. Until her marriage, in 1905, she had made her home with her father, on a farm. The mother had died in 1901. After the marriage, the testatrix and her husband continued to live in the same home with the father until his death, in 1907. She received about $5,000 as her share of her father's estate. In 1909, she bought a little farm, near Oxford Junction, of 20 acres, which she and her husband occupied as a home until the year 1916. Her husband was the witness Stuhr. In November, 1916, she filed a petition for divorce, alleging adultery on the part of her husband. She obtained a decree on March 10, 1917. After that date, she continued to occupy her home until the first of March, 1919, on which date

she conveyed it to a purchaser, pursuant to a previous contract. During the 10 years of her occupancy of this home, her near neighbor was Hall. His farm joined hers. Hall's family consisted of a wife and five children. The wife died in the summer of 1916. In 1917 and 1918, Hall farmed the tillable land of the little farm of the testatrix. The will of the testatrix was executed on February 22, 1919. A few days later, she left the neighborhood, and entered a training hospital at Saginaw, Michigan, for the purpose of preparing herself for service as an army nurse. While in such hospital, she died, on May 4, 1919, of pneumonia, after a week's illness. So far as appears, Hall had nothing to do with the making of the will, nor did any other beneficiary have anything to do therewith. Two of the witnesses to the will were lady friends of the testatrix. The third witness was an attorney. That a mutual affection existed between Hall and the testatrix at the time the will was made, and at the time of her death, is clearly indicated by the record. Among the effects of the testatrix, after her death, were many letters which had been written to her by Hall. These were put in evidence by the contestants. They purport to be the letters of a lover, and indicate that mutual love existed between the two. These all bear date in 1919. Some stress is laid in argument upon expressions contained in some of these letters. We have read them carefully. We can find nothing in them which in any degree disparages the character of either party to the love affair. Contrary inferences drawn from expressions therein by appellant impress us as greatly strained. There was no impediment, legal or moral, to the association of these people with a possible view to matrimony. The appellants do not claim otherwise. The real theory of appellants is that this affectionate relation, so apparent in 1919, had its beginning prior to the divorce of the testatrix, and that the mutual conduct of the two people at such former time was so close and intimate as to indicate illicit relation. The evidence relied on consists, in part, of the fact that the Hall and Stuhr families were intimate during the life of Mrs. Hall, and before the divorce of the Stuhrs. Mrs. Hall was sick three or four months in her final illness, and the testatrix was a constant visitor and caretaker at her bedside. The sick woman was the mother of five children, and it may well be inferred that any

person who assumed to care for her was not without abundant occupation. On this line of evidence, the brothers were witnesses, and Stuhr, the divorced husband, was also a witness. All the circumstances relied on as incriminating were known to the witnesses at or about the time of their occurrence, and yet they all testified that they continued always on friendly terms with Hall. There is one definite item of evidence to which specific reference will be made later. The evidence shows that the testatrix was a woman of ability and strong personality. She was well educated, and mentally active. She was a college girl, a prominent church worker, a leader in Red Cross work. The final act of her life was to give herself unreservedly to patriotic service along the line of nursing. During the time of her occupancy of the little farm, she devoted herself largely to the raising of fancy chickens, as an occupation. She transacted her own business, and did it carefully. She sold her own farm. After her departure for Saginaw, Hall sold a horse for her, and collected a couple of small accounts, and deposited the same at the bank. The will executed by her was retained in her own custody, and placed under lock and key, with her private papers in the bank. The substance of the evidence relied on by contestants consists of the fact that Hall was much about the place of the testatrix, and was seen there frequently and usually by passersby, and that such frequent visits extended as far back as the year 1916.

There is another item of evidence which has received considerable attention in the briefs. The claim for it by appellant is that it amounts to an admission by Hall of illicit relations.

**2. WITNESSES: confidential communications: attorney and client.** The witness was Magruder, one of the attorneys for contestants, called from the trial table to the witness chair. Appropriate objection was made to his offered testimony by each of the proponents, including Hall, on the ground that the communications offered in evidence were confidential and privileged, as between attorney and client. The witness testified as follows:

"I have never been Mr. Hall's lawyer in any matter. Mr. Hall did not employ me at that first interview. He said: 'Are you at the present time employed by the Lathrop boys in the Gladys Lathrop will contest?' I said: 'Up to the present time,

they have not employed me.' He said: 'Are you in a position, then, to represent me?' I said: 'So far as I know, I am.' He said: 'You are a home fellow here, and I have got to have attorneys to represent my side of that case, and I want to employ you.' I said: 'Mr. Hall, have you any other attorney, at the present time?' He said: 'Yes, I have employed Mr. Rhinehart, of Anamosa.' 'Well,' I said, 'I will tell you frankly that I have never worked with Mr. Rhinehart, and it is just a question in my mind whether Mr. Rhinehart would care for me to work with him.' I said: 'You might go and see him, and if he wants me, then I will work with him in the case. If he don't want me, it is all right.' And he said: 'Then, I will go see him, and if he don't want you, will you suggest some attorney that would be good to represent me in this case to work with Mr. Rhinehart?' I studied a while, and said: 'I know of no better attorney at the present time to assist you than Mr. C. J. Lynch, of Mechanics-ville, Iowa.' He said: 'He is employed, though, by the Lathrop boys in another case, and I don't know whether you could get him or not, but it is all right to go and see him.' He said: 'I am going to Anamosa today, and I will be back to see you this afternoon, and if Mr. Rhinehart wants you to work with him, I want you in preference to anybody else. If he don't want you, then I will let you know.' He came back that afternoon, and told me that he had been up to see Mr. Rhinehart, and Mr. Rhinehart had told him the same thing I had: that we had never worked together, and that he felt Mr. Lynch was better qualified to assist and work with him in this case than I was, and he would rather that he would get Mr. Lynch, and he said: 'Now, Mac, I don't want you to feel hard of me about doing as I have done;' and he said he would like to have me, but under the present circumstances he couldn't employ me. I said, 'All right.' That was the beginning and the end of the negotiations between me and Mr. Hall about being employed. Mr. Hall said that he understood that the other side—that the Lathrop side— were going to show that he had immoral relations with Miss Lathrop, and he said: 'The only doubt that I have in my mind now is that there may be such a chance of certain evidence being introduced wherein I, Hall, have a chance to go to the peniten-tiary, and if there is any chance of that, I am going to drop the

case right now, and if there ain't, I am going to fight it to a finish.' 'Well,' I said, 'Mr. Hall, what makes you think there would be such a chance for you to go to the penitentiary?' 'Well,' he said, 'they claim I am guilty of adultery with Miss Lathrop, before she got her divorce from John Stuhr.' I said: 'Well, if they can show that, that you had sexual intercourse with her before her divorce, and if that is not barred by the statute of limitations, there would be a chance, providing Mr. Stuhr brought the action, of your spending some time behind the bars. If they cannot show that, then there is no use of your being afraid.' He said: 'I don't think they can show anything of that kind that happened before her divorce, although they might be able to show something like that happening after her divorce.' "

The climax of all the foregoing evidence is in the last sentence. The claim for it is that it amounts to an admission of guilt. Magruder also testified as follows:

"I asked Mr. Hall if he had considered the fact that an engagement between him and Gladys Lathrop, the deceased, would show a consideration for the gift. He answered that he had considered that phase of the matter, and that there was no engagement between them. I said: 'I understand there was some letters passed between you and Miss Lathrop, after she went to Saginaw, Michigan. Wasn't there something mentioned in those letters showing that you and she were engaged?' "

The employment of an attorney by a client, where there is prior mutual acquaintance, is often not a very formal affair. Employment and consultation are often quite concurrent. The ethics of the profession will not permit an attorney's office to become a trap for a litigant who is unconscious of the formal rules which hedge the honor of an attorney. The questions put by the attorney in this case to his proposed client indicate his own state of mind, and that he was actually carrying on a consultation and giving advice. He could not have intended the proposed client to understand anything else. He advised the client that he was open to employment, and the client advised him that he wanted to employ him. A question was raised as to whether his employment would be satisfactory to other coun-

sel. Even this question would not necessarily prevent Hall from asking legal advice and receiving it. It was the privilege of the attorney to refuse to give advice, unless he were retained for the future trial of the case. It was also his privilege to assume the relation, and give the advice. The fact that there was no formal employment or retainer is not controlling. A right to reasonable compensation for the advice would be implied.

To say nothing now of the repugnance of this evidence to professional ethics and to statutory morals, and to overlook the fact that the objection to it should have been sustained, and to say nothing even of the fact that an admission of one legatee is not binding upon the other legatees, we are united in the view that the evidence itself is too shadowy and unsubstantial to justify a jury in overturning the will thereon. It is a mere expression of an apprehension of the kind of testimony which contestants might produce. It did not purport to be an admission of the fact itself. The most that can be said for the evidence is that it was a scintilla. We are united in the view, also, that the communication thus testified to was confidential and privileged, under the statute. If, therefore, we were to deem the evidence sufficient to have sustained a verdict, we could not properly reverse, and send the case back for retrial. We are firmly of the conclusion that the trial court properly directed the verdict.

II. At the close of the contestants' evidence, the proponents moved for a directed verdict. This motion was argued and submitted. The court having announced its view adverse to the contestants, they immediately asked to dismiss. This request was denied. A formal verdict was submitted to the jury, and signed by one of their number. Complaint is directed against this ruling of the court, in refusing to the contestants the right of dismissal.

The contestants were not in the attitude of plaintiffs, within the meaning of the statute. Plaintiffs may dismiss their action. The contestants had no action. They were defending. True, they set up an affirmative defense. Perhaps they were entitled to withdraw their defense. That, however, would be quite immaterial. That is not what they asked to do. Their announcement to the court was: "The case may be dismissed."

Were the contestants in control of the ''case,'' so that they could dismiss it? The proponents were pressing the probate of the will, and the contestants were resisting. Needless to argue that the contestants could not stop the proceedings in probate of the will by withdrawing their defense thereto. What the legal effect of such withdrawal on their part, if permitted, *would* be, or what the legal effect of the refusal of the court to permit such withdrawal *may* be, is not the question before us. We think there was no error at this point. The judgment below is—*Affirmed.*

WEAVER, PRESTON, and DE GRAFF, JJ., concur.