IRENE GLIDER et al., Appellants, v. KATHERINE MELINSKI (alias Shelangoski) et al., Appellees.

No. 46910.

DECEMBER 17, 1946.

REHEARING DENIED FEBRUARY 14, 1947.

Ralph H. Munro, of Fairfield, for appellants.

Thoma & Thoma, of Fairfield, for appellees.

T. A. Michels, Guardian ad litem, of Washington, for Martin Shelangoski, Darlene Shelangoski, and Frederick Pehler, minor defendants.

MULRONEY, J.—On or about January 31, 1944, the will of Frank A. Shelangoski was admitted to probate in the district

court of Washington County, Iowa. The will provided in paragraph 1 for the payment of his debts and funeral expenses, and in paragraph 2, it provided as follows:

"After the provisions of paragraph one hereof are carried out, then it is my will and I hereby will, devise and bequeath all the property of which I die seized of, both real and personal to Katherine Melinski, who has been my housekeeper and has helped me in the acquiring and preserving of my property, same to be used by her for her care and enjoyment during her life, and subject only to the following directions to her; that she pay to each of my children named as follows, Adam R. Shelangoski, Andrew A. Shelangoski, Irene Glider, Martha Johnston, Bertha Kupka and May Hopkins one dollar each, as soon after my death as it is possible to do so as their share in my estate."

Paragraphs 3 and 5 of the will directed that the residue of the estate that remains after the death of Katherine Melinski shall be disposed of as follows: Two hundred dollars to Irene Glider; two hundred dollars to Adam Shelangoski; one hundred dollars to each of Adam's children, Martin and Darlene; and all balance "to go to Frederick Pheler who has faithfully helped me on the farm the past years." Katherine was named as executrix and she was directed to repay all money Adam had advanced to the testator.

The testator's twin sons, Adam and Andrew, and his four daughters, Martha Johnston, Irene Glider, Bertha Kupka, and Mary Hopkins, filed their petition on the 14th of May 1945, alleging they were the sole heirs of the testator and that the above will was not the voluntary will of the testator but the result of Katherine's undue influence over their father.

The testator's children all testified. The boys were forty years old at the time of the trial and the girls ranged in age from the youngest, Mary, who was twenty-six, to Irene, who was thirty-five.

The record shows that Frank Shelangoski married Katie Boroski and they went to live on a farm in Washington county. When the girls were of school age he brought them to Washington and placed them in the home of Katherine Melinski in

order that they might attend parochial school in Washington. Adam testified that he understood Katherine was reared in the same neighborhood as his father when his father was a young man. At times the boys, when they were children, would stay overnight with their sisters at Katherine's home or apartment in Washington. It seems that Katherine generally worked as a maid or in the laundry in Washington.

The boys testified that on one occasion when they were about twelve years old their father was with them at Katherine's home in Washington and he slept with Katherine. Adam testified he knew that his father had "been frequenting the house" where Katherine lived in Washington for ten years prior to 1924, when he and Andrew accompanied Katherine and his father and Katherine's brother Leo on a trip to Minnesota. .He stated that on this trip his father and Katherine registered as Mr. and Mrs. Shelangoski. The evidence shows that the girls stayed with Katherine during most all of their school days; that Katherine took care of them—washing and ironing their clothes and cooking the meals and, with the children's help, keeping the apartment clean and neat. When they worked, Katherine handled their money and their money. and Katherine's wages would be used to pay the household expenses. They generally went back to the farm during vacations and lived with their mother. Mary, the youngest, was the last to leave Katherine. She left about 1936, when she was about sixteen years old. The girls testified to many occasions when their father would stay all night at Katherine's apartment during the years they lived there and on those occasions their father and Katherine occupied the same bedroom. This continued until 1936. In March of 1937 Katherine went out to the farm and about two or three months later Mrs. Shelangoski left the farm and she lived with one or another of her married children until she died in October of 1939. Katherine lived on at the farm as Frank Shelangoski's housekeeper and around the first of October 1943 Frank Shelangoski was taken seriously ill. He consulted a doctor on October 6th and the doctor testified he found him suffering from pernicious anemia, which was quite progressive, and with no chance of recovery. He was not out

of bed much after October 6, 1943. On October 9th, while Mary Hopkins and her husband, Gerald Hopkins, were visiting at the farm, Katherine went to Washington with Frederick Pehler, a young man who had been helping on the farm. Mary Hopkins testified that while Katherine was gone from the house Mr. Louis J. Kehoe, an attorney in Washington, Iowa, arrived at the house with a typewriter. She stated her father was in bed and Mr. Kehoe went to his room and talked with him and when he came out he sat down at his typewriter and drew up some instrument; that Katherine arrived home while Mr. Kehoe was still there and that there was some talk by Mr. Kehoe and her father about her Uncle Pete (testator's brother) coming back to be a witness to the will. She remembered Mr. Kehoe sitting around awhile and his finally asking her father if he did not have some neighbor who could be called in to witness the will and she heard her father suggest a neighbor, Mr. Tucker, and she heard her father tell Katherine to call Mr. Tucker and ask him to come over. She stated she heard Katherine tell her father that Mr. Tucker was there and that Katherine then went outside to feed the chickens and do other chores and Mr. Kehoe and Mr. Tucker went into her father's room. She thought Katherine might have been back in the house again while Mr. Tucker was there, to bring eggs or something of that kind, but she did not go to the sickroom. The testimony of her husband, Gerald Hopkins, does not quite conform to her version of what transpired on October 9th. He testified:

"Mr. Kehoe came shortly after dinner. Nobody was with him, he had a typewriter with him, he went into Frank's bedroom, I believe he was there about half an hour. Katherine Melinski was called into the room and she went in there. I think they were in there—well, it is just hard to judge, five or ten minutes, I couldn't say for sure, then they came back out into the room and Mr. Kehoe left. He did do some typewriting. Later, before he left there was someone that came down there, I didn't know him, he was in the room. Mr. Kehoe was typewriting while this man was in the room, this was all going on in the room where Mr. Shelangoski was. The typing was done in the same room where Mr. Shelangoski was. Frank and

Mr. Kehoe and this fellow came in. He was not in while some of it was going on. Kehoe was doing quite a bit of typewriting. I could hear it from where I was sitting in the living room. I believe I heard the typewriter while Katherine Melinski was in there too.''

Mr. Tucker, who had been Frank Shelangoski's neighbor for twenty-five years, testified he came to the Shelangoski home in response to the telephone call: that Mr. Kehoe met him out in the yard and explained that Frank's brother was expected. to come and sign some instrument and that he did not come so they had called him. He stated that he went to the sickroom with Mr. Kehoe, where he signed as a witness on the will and left in about fifteen minutes; that Katherine was not in the room at the time and he did not remember seeing Katherine around the premises on that particular occasion. The only thing he remembered that Frank said when he came into the sickroom was: " 'I wanted to get my business in shape. I do not know whether I am going to die or not.' " He had been a neighbor of Frank Shelangoski for twenty-five years and had exchanged work with him. He stated that Frank was always the ''boss.'' The following is a part of Mr. Tucker's testimony:

''Q. He was that type of individual—he was very definite in his ideas and there wasn't anybody that influenced him with reference to those ideas? A. No, I do not believe so. Q. He was one of those men who had made his own way in life and managed his own affairs without interference or suggestions from other people? A. I think so. Q. As you observed that situation. A. Yes.''

Sometime about January 14, 1944, Frank Shelangoski married Katherine. The record shows that his brother, I. C. Shelangoski, and his brother's wife, were present in the Shelangoski home the day of the wedding. I. C. Shelangoski testified that Frank sat up in a rocking chair during the wedding and he heard Katherine say ''they ought to have been married long ago.'' On January 19, 1944, Frank Shelangoski died at the age of sixty-four years. The only intimation in the record as to the size of his estate is a stipulation which would indicate he

owned a farm of one hundred twenty acres in Washington county, which was mortgaged in the principal sum of $5,500. At the conclusion of the plaintiffs' testimony the trial court directed the verdict for defendants.

While plaintiffs' brief and argument is in one division, there are really two propositions argued. The first contention of plaintiffs is that, the evidence being sufficient to warrant a finding of a long-continued illicit relationship between the deceased and Katherine prior to the execution of the will, this, standing alone, will support the setting aside of the will. The second proposition is that if illicit relationship be considered as insufficient to make out a prima facie case, then it is a circumstance which, with other evidence of acts and circumstances showing Katherine's undue influence, would support the setting aside of the will.

I. The only decision of this court which touches the proposition is the case of In re Estate of Lathrop, 190 Iowa 684, 685, 180 N. W. 737. There the argument was made ''that, the illicit relation being established, this of itself furnished sufficient evidence to go to the jury on the question of undue influence.'' But we did not decide the proposition for we held the evidence of illicit relationship was insufficient. Two other decisions of this court cited by plaintiffs, Leighton v. Orr, 44 Iowa 679, and Hanna v. Wilcox, 53 Iowa 547, 549, 5 N. W. 717, 718, involve actions to set aside transfers where the transferor had illicit relationship with the transferee. The rule of those cases, as stated in the Hanna case, is:

''* * * when such relations exist, the burden is upon the one claiming under a conveyance executed by the other party to the unlawful relations to show that it was not procured by undue influence.''

But this rule has no application to testamentary gifts. We so held, with respect to the existence of a fiduciary relationship, in Graham v. Courtright, 180 Iowa 394, 405, 161 N. W. 774, 777, where we stated:

''The doctrine that undue influence is to be presumed as between parties inter vivos, dealing with each other when fi-

duciary relations exist between them, has no application to testamentary gifts.''

The opinion states the reason the rule applies in inter vivos transactions is that a person is not likely to part with property without consideration during life and when it appears he has given it away to one in a dominating position the presumption arises that he has not freely parted with it. But the reason for the rule is not present where the testator is undertaking to give his property away upon his death. The opinion in the Graham case, at page 406 of 180 Iowa, page 778 of 161 N. W., points out:

''There cannot be an assumption that testator would not part with his property, for in the nature of things that is the object of his testament, and the property necessarily must pass to others upon his death. Another reason for this distinction, recognized by the authorities, is that the donee or grantee inter vivos is a party to the transaction and possessed of knowledge in relation thereto, and therefore is in a situation to present the facts to court or jury, whereas a beneficiary is not necessarily a party to the execution of the will, and may have no knowledge thereof until years after it has been made.''

For the same reasons a presumption of undue influence should not be based on the mere existence of an illicit relationship between the beneficiary under the will and the testator. The law accords to the testator a free right of testamentary disposition consistent with law. The effect of a principle that his will could be annulled by a mere showing of an illicit relationship between himself and the beneficiary would, in a great many cases, be a denial of this free right to dispose of his property as he wishes. The authorities generally hold that an illicit relationship is not sufficient to warrant a conclusion of undue influence. The rule as stated in 68 C. J. 786, section 468, is:

''The mere existence of illicit, improper, unlawful, or meretricious relations between the testator and the beneficiary or the beneficiary's mother is insufficient of itself to prove fraud or undue influence, although the existence of such relations is

an important fact to be considered by the jury along with other evidence of undue influence, giving to other circumstances a significance which they might not otherwise have * * *."

And in 28 R. C. L. 148, section 102, it is stated:

"There appears to be a general concurrence in the authorities that an illicit relation is not sufficient per se to warrant a conclusion of undue influence, and that no presumption of undue influence arises merely from the fact that a man, who is of sound mind, makes a will in favor of his mistress or of one with whom his relations have been meretricious."

A good many of the cases holding the above rule have been collected in the annotations in 66 A. L. R. 243, and 154 A. L. R. 589. See, also, In re Kelly's Estate, 150 Or. 598, 46 P. 2d 84. In line with the weight of authority we hold the existence of an illicit relationship between the testator and a beneficiary is not enough, per se, to raise a presumption that the will was procured by undue influence.

II. The evidence of other acts and circumstances which, plaintiffs argue, show that the will was the result of Katherine's undue influence consists of the following: (1) false reports of the children's conduct and disparaging statements about the children by Katherine (2) the serious illness of the testator at the time the will was drawn (3) the fact that Katherine went to town the day the will was drawn and Attorney Kehoe arrived from town shortly thereafter, from which it is to be inferred she employed Kehoe to "prepare and cause to be executed the instrument in question" (4) Katherine's presence in the sickroom when the will was drawn, together with her attorney, Kehoe (5) the testator's daughter, though present in the home, was not admitted to the sickroom and knew nothing of any will being drawn or contemplated (6) her attorney, Kehoe, was a witness to the will and intercepted the other witness in the yard to tell him what he was wanted for (7) Katherine coerced the testator into a marriage with her on his deathbed (8) the instrument was not read when it was signed.

The alleged false reports of some of the children's conduct and the incidents when she called them names all occurred

about seven years before the will was drawn. The girls testified Katherine told their father they stayed out at night later than they actually did and she called them liars and sneaks to their father and on one occasion she called one of the girls a "snake in the grass." This would hardly show Katherine's undue influence in the execution of a will seven years later. The record shows the testator was seriously ill with an incurable malady when he executed the will some three months before he died, but that is the full extent of the testimony. There was no evidence that his illness affected his mind in any way. Mere proof of his physical illness does not support the claim of undue influence. The inference that Katherine went to town and hired Mr. Kehoe to come to the farm and draw the will is, so plaintiffs argue, to be drawn from the fact that Katherine went to town for the announced purpose to get groceries, and Mr. Kehoe did arrive while she was in town. The inference is too strained. Of course, proof of undue influence can be circumstantial, but the evidence of circumstances must give rise to reasonable inferences. One would first have to infer a plan or scheme on Katherine's part to have the testator draw a will in her favor before one could reasonably believe her trip to town was actually to employ Mr. Kehoe to come to the farm to draw the will. Whether Katherine was present in the sickroom when the will was drawn is not clearly shown in the evidence. The daughter Mary testified Katherine arrived home from her trip to Washington about the time Mr. Kehoe had finished typing. Mary's husband said Katherine was called into the room; that the typing was done in the sickroom, and he believed he heard the typewriter while Katherine was in the sickroom. Counsel's argument is that her presence in the room with her "hired hand" (Mr. Kehoe) shows the will was the product of her undue influence. Katherine was housekeeper for the sick man. The mere fact that Katherine might have gone to the sickroom while the attorney was typing the will would not be sufficient to base a conclusion that the will was the result of her undue influence when there was no showing that she even knew the contents of the will. Counsel's argument is based on an assumption that Mr. Kehoe was Katherine's attorney. As we have pointed out,

there was no testimony to support such an assumption. There is no testimony that Mary Hopkins and her husband were "not admitted" to the sickroom while the will was being drawn, in the sense that they were told by anyone to stay out of the room. Mary's testimony shows she did know that her father was executing a will. Counsel argues the "hired hand" was one of the witnesses to the will and he intercepted the other witness in the yard to tell him that he was wanted as a witness to the will. The incident has no significance unless one first assumes Mr. Kehoe was Katherine's "hired hand," which, under this record, we cannot do. There is not any evidence that Katherine coerced the testator into marrying her, unless it be her statement at the time they were married to the effect that "they ought to have been married long ago." In view of the relationship testified to by the other witnesses the statement was the natural expression of one who appeared to have lived in intimate union with the man she was marrying. Her understandable desire to crown that union with a marriage ceremony cannot support a conclusion that the will, drawn three months before, was the result of her undue influence. The argument that the will was not read by the testator when he signed it is based on Tucker's testimony. His testimony is that neither Mr. Kehoe nor the testator read it in his presence but it was read to the testator but not in his (Tucker's) presence.

This disposes of all the evidence which, counsel argues, aids the evidence of illicit relationship to support the claim of undue influence. The evidence which counsel points to does not reasonably tend to show that Katherine exerted undue influence on the mind of Frank Shelangoski. Mr. Tucker, plaintiffs' witness, states that Frank Shelangoski was a man of very definite ideas and nobody influenced him with reference to those ideas and he managed his own affairs without interference or suggestions from other people. Were a jury to hold such a man was unduly influenced by Katherine so that his will was really the expression and will of Katherine, and not the free expression of his own will, under the record in this case, they would have to resort to strained and unreasonable conclusions and inferences. Frank Shelangoski had the power to dispose of his property

by his will. Our duty is not to criticize the conduct or morals of the testator or Katherine. As said in In re Kelly's Estate, supra, 150 Or. 598, 618, 46 P. 2d 84, 91:

" * * * the testator, if he chooses, may be actuated by base motives. The only essential is that the will which prompted him to make the bequest must be the will of the testator."

The testator may have been prompted by an attachment for Katherine greater than his affection for his own children when he made the bequest to her. He may have felt that, because of their intimate relationship extending over a period of forty years, he was morally bound to provide for her. That such an attachment and such an intimate relationship might be a transgression against good conduct and his marital relationship is immaterial in the absence of a showing that the party rewarded by his affection used her position to influence the testamentary bequest. Those who contest this will have the burden of showing that Frank Shelangoski was not exercising his own free will when he executed the instrument. Their burden is not met by showing an illicit relationship which might have prompted the testator to leave his property in the manner he did. They fail to show more. The judgment is affirmed.—Affirmed.

GARFIELD, C. J., and OLIVER, WENNERSTRUM, HAYS, and HALE, JJ., concur.

MANTZ, SMITH, and BLISS, JJ., dissent.

MANTZ, J. (dissenting)—Being unable to agree with the majority opinion, I respectfully dissent. I feel that such opinion is based upon a misconception of the effect of the evidence, resulting in an unwarranted conclusion, the net effect of which is to give to a paramour of the testator practically the whole of his property to the exclusion of the natural subjects of his bounty. Under the record no such result should be permitted.

The case is a will contest and the ground set forth is that of undue influence claimed to have been exercised over the testator by the principal beneficiary. There is but one question

in the case: Was there sufficient evidence shown on behalf of the contestants to entitle them to have the case submitted to the jury? The trial court answered in the negative, directed a verdict against them, and this court in the majority opinion has set its seal of approval upon such action.

Many cases have come before this and other courts in which such a question has been considered. It usually arises where questions are raised involving contracts, conveyances, and testamentary devices. The matter of its existence, its scope, extent, and effect has frequently been passed upon by this court. In the first instance, the trial court decides whether the party claiming undue influence has produced sufficient evidence to warrant the court in submitting the issue to the jury. If so, then it becomes the province of the jury to pass upon its sufficiency to sustain the claim made. Like most disputed questions, the presence or absence of undue influence may be shown by either direct or circumstantial evidence.

The term "influence" has been often dealt with by this and other courts. The yardstick by which it is judged has no set formula or standard. It has been held that in the making of a will undue influence is something that has the effect of subjecting the testator's will to that of the person exercising it. Also, influence to be undue so as to invalidate a will must destroy the free agency of the testator. In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114; Hann v. Hann, 202 Iowa 807, 211 N. W. 495; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301; Worth v. Pierson, 208 Iowa 353, 223 N. W. 752; In re Estate of Brooks, 229 Iowa 485, 294 N. W. 735; Shaw v. Duro, 234 Iowa 778, 14 N. W. 2d 241; In re Estate of Telsrow, 237 Iowa 672, 22 N. W. 2d 792. I claim that the record in this case comes within the rules as set forth in such cases.

In the rather recent case of Shaw v. Duro, supra, 234 Iowa 778, 783, 14 N. W. 2d 241, 244, there was involved the question of undue influence in the making of a will. Hale, J., speaking for the court, said:

"This court has frequently held that in cases of this kind we may take into account the physical condition and strength of mind of a person whose will is under consideration." Citing

In re Estate of Wiltsey, 135 Iowa 430, 109 N. W. 776; In re Estate of Eiker, 233 Iowa 315, 6 N. W. 2d 318; Stephenson v. Stephenson, 62 Iowa 163, 17 N. W. 456.

In the Duro case it is further held that in such a case undue influence may be shown by circumstantial evidence, and further, that the main question in any case of this kind is one of fact. Also, that inequitable and unjust provisions of a will in a case where undue influence is claimed may properly be taken into consideration. See Cash v. Dennis, 159 Iowa 18, 139 N. W. 920. On this last, see In re Estate of Townsend, 122 Iowa 246, 97 N. W. 1108; Zinkula v. Zinkula, 171 Iowa 287, 154 N. W. 158; Pirkl v. Ellenberger, 179 Iowa 1122, 162 N. W. 791; Busick v. Busick, 191 Iowa 524, 182 N. W. 815; In re Estate of Rogers, 229 Iowa 781, 295 N. W. 103; In re Will of Johnson, 201 Iowa 687, 207 N. W. 748; Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55; Parker v. Lambertz, 128 Iowa 496, 104 N. W. 452.

The appellants, all children of the testator, claim that the will was the product of an undue influence exercised over the testator by Katherine Melinski. To sustain their claim they presented to the court facts and circumstances from which I think that a jury could properly find that such influence existed —not for a limited period of a few years but for a period of nearly forty years. Their specific claim is that, added to the illicit and unlawful relationship of the testator and Katherine, there were other facts and circumstances from which it might be fairly inferred that such influence existed and that the will was its product.

At the conclusion of contestants' case the trial court, upon motion of the proponent (appellee), directed a verdict against contestants. As bearing on the record and the situation then existing, I quote two statements made by the trial court just before directing the verdict:

"All I am interested in is whether the Court has ever held that the mere fact of illicit relations raises any presumption of undue influence."

Also:

"There is a long line of testimony here as to illicit rela-

tions existing between Frank Shelangoski and Katherine Melinski covering a period of nearly forty years. That testimony is relevant on the question of undue influence but *of itself* is not sufficient to justify a jury in finding there was undue influence. More is required.''. (Italics supplied.)

While the majority opinion rather minimizes the evidence of such illicit relations, yet the record is replete with facts and circumstances from which no other conclusion is possible. The record abundantly shows that over this long period of time there were carried on almost openly illicit relations between testator and the principal beneficiary. During practically all of this time the testator had a wife, the mother of his children, who kept the home and worked and labored as a housewife and only quitted it when testator brought into that home his paramour of at least a third of a century.

So I feel that we can start with the premise that testator and Katherine Melinski indulged in illicit relations up to the time the will was drawn on October 9, 1943.

I think it well at this point to call attention to certain events and dates which to me are highly significant. Frank Shelangoski married Katie Boroski about forty years prior to his death on January 19, 1944. As soon as the children became of school age they were placed in the home of Katherine Melinski, where they were kept nearly all of the time until their schooling was finished. The Shelangoskis lived together until about the middle of 1937. Shortly prior thereto Katherine Melinski came to the testator's home and following this event the wife left, never to return, and from that time on was supported by the appellants herein. She died October 31, 1939. Katherine continued to live with testator. Testator became seriously ill in October 1943. A physician was called on October 6, 1943; an examination revealed that the testator was a very sick man, with no hope of recovery, being in the last stages of pernicious anemia. October 9, 1943, Katherine went to Washington and some hours thereafter Attorney Kehoe came and prepared the will in question. The testator was in his bedroom, confined to his bed. Katherine was in the bedroom a part of the time Kehoe was there; a daughter of testator was in the house but was not in-

vited to the bedroom. On January 10, 1944, testator and Katherine were married. During the ceremony the testator reclined in a chair. Testator died nine days later.

The will gave to each child $1. Substantially all of his estate of approximately $7,500 was given to appellee.

It seems to me that the circumstances surrounding the coming into the home of Katherine Melinski, the departure therefrom of testator's wife, the sudden illness of testator, the trip to Washington by Katherine a few hours later, the coming to the farm of Attorney Kehoe, the making of the will, and the marriage of testator and Katherine shortly thereafter, all are circumstances quite significant as bearing not only on the relationship of the parties but as indicating the moving force was Katherine Melinski.

I think there is ample evidence in the record from which a jury might infer, by reason of the illicit relations existing between testator and Katherine Melinski over a period of almost forty years, and the circumstances under which such relations were carried on, added to other facts appearing in the record, that such claimed undue influence existed.

I find no Iowa case which holds that illicit relations between a testator and the principal beneficiary is sufficient in *itself* to sustain a finding that undue influence existed to such an extent as to invalidate an instrument such as a will. To sustain appellee's claim in that respect they cite the case of In re Estate of Lathrop, 190 Iowa 684, 180 N. W. 737. In that case it was sought to set aside the will of Gladys M. Lathrop on the grounds that the principal beneficiary had indulged in illicit relations with the testatrix and that the will resulted therefrom. Various letters were introduced which it was claimed established such illicit relations. The trial court denied the claim and this court affirmed such action. In brief, the sum total of the finding of this court was that the facts failed to show that such illicit relations existed. This decision certainly does not lay down any rule which can have application to the facts as shown by the record in this case. The Lathrop case is not analogous to the present case. The illicit relationship of the testator and Katherine Melinski being shown, I think that

such fact alone must be supported by other facts and circumstances to justify a court in submitting the issue of undue influence to the jury. Before calling attention to such other facts and circumstances I desire to refer to some cases from other jurisdictions upon the question of the effect of illicit relations in the making of wills where undue influence is claimed. See Waters v. Reed, 129 Mich. 131, 88 N. W. 394; Snyder v. Erwin, 229 Pa. 644, 79 A. 124, 140 Am. St. Rep. 737; In re Phillips Estate, 244 Pa. 35, 90 A. 457; Boyd v. Boyd, 66 Pa. 283; Smith v. Henline, 174 Ill. 184, 51 N. E. 227; Lamborn v. Kirkpatrick, 97 Colo. 421, 50 P. 2d 542.

In the case of Waters v. Reed, supra, there was involved the probate of a will where it was claimed that the same was procured by undue influence arising out of unlawful and illicit relations between the testator and the principal beneficiary, a paramour of the testator. In that case the testator was debilitated in health and in making the will devised the bulk thereof to his paramour to the exclusion of those of his own blood. The court held that whether the illicit relations, coupled with the other facts and circumstances, constituted undue influence was a fact question.

In the case of Snyder v. Erwin, supra, 229 Pa. 644, 646, 79 A. 124, the court had for consideration the matter of illicit relations as bearing on undue influence in a testamentary device. There was evidence of meretricious relations between the testator and a married woman. The testator was somewhat enfeebled and went to live with his paramour. His will gave his daughter a trifling sum of money and the rest of his estate to the paramour. The jury found in favor of the contestant. In affirming the trial court, the Pennsylvania court stated:

"It clearly appears that the unlawful relation thus established began several years before; that it existed at the making of the will, and that it continued thereafter. This fact, taken in connection with the further fact that the will gives the entire estate to the proponent, to the exclusion of an only daughter against whom no other grievance existed than that she had declined to receive into her home the woman she believed to be her father's paramour, was evidence of an undue

influence exerted by the proponent affecting the dispositions of the will, and sufficient in itself to carry the case to the jury."

I will quote briefly from the case of Smith v. Henline, supra, 174 Ill. 184, 196, 51 N. E. 227, 231, where the claim was made that the will was the product of undue influence exercised over testator by a mistress:

"The existence of an illicit relation between a deceased testator and his mistress will not give rise to a presumption of undue influence as a matter of law, but undue influence is more readily inferred in case of a will made in favor of a mistress than in the case of a will in favor of a wife. The existence of the relation is a circumstance to be considered by the jury along with other facts in the case. * * * The jury have a right to consider the fact of the unlawful relationship where there is proof, as there is in the case at bar, tending to show constraint and interference, impaired mental capacity, loss of will power, and sickness or disease at the time of the making of the will." Citing case of Saxton v. Krumm, 107 Md. 393, 68 A. 1056, 17 L. R. A., N. S., 477, 126 Am. St. Rep. 393.

The Colorado Supreme Court somewhat recently passed upon such question, stating that in so doing it was required to choose between two rules. In an earlier case, Taylor v. Taylor, 79 Colo. 487, 490, 247 P. 174, 176, involving a deed, it had held "the mistress of a grantor has the burden of proving that a conveyance to her was uninfluenced by that relationship."

In the more recent case, Lamborn v. Kirkpatrick, supra, 97 Colo. 421, 426, 50 P. 2d 542, 544, a will contest, that court said:

"In so holding, we thus deliberately chose one of two distinct lines of authority, and the question now is whether the same principle applies in cases of wills. * * * It is true that some courts, when considering instances of alleged undue influence, draw a distinction between transactions inter vivos and testamentary dispositions. There seems to us no sound reason for holding one way as to the former and another way as to the latter. We deem it proper to attach to illicit cohabitation the same effect where undue influence is charged to have brought about the execution of a will as where a case involves the execu-

tion of a deed. The moral basis * * * is as strong in one case as in the other. The unlawful intimacy * * * usually assumes a clandestine form and, after the testator's death, would almost invariably render such undue influence as results therefrom incapable of proof except by the aid of the presumption which the instruction in question undertakes to recognize." Citing Snyder v. Erwin, supra, 229 Pa. 644, 79 A. 124, 140 Am. St. Rep. 737.

This court has already squarely held that: " * * * influence obtained by immoral conduct and adulterous relations is regarded in the law as undue influence, and cannot be exercised to the advantage of the person possessing it, and when such relations exist, the burden is upon the one claiming under a conveyance executed by the other party to the unlawful relations to show that it was not procured by undue influence. *The exercise of unlawful influence will be presumed* when the parties to a deed live in adulterous relations in the absence of proof of a lawful consideration." (Italics supplied.) Hanna v. Wilcox, 53 Iowa 547, 549, 5 N. W. 717, 718, citing Leighton v. Orr, 44 Iowa 679.

It is true these were cases involving deeds but I am unable to see any distinction between a deed without consideration and a will when the validity of the instrument is attacked for alleged undue influence of the beneficiary in procuring its execution. Each is a mechanism for consummating a *gift* to a beneficiary. If a gift is made, the use of undue influence growing out of the illicit relationship should be presumed in either case.

In Leighton v. Orr, supra, 44 Iowa 679, 689, we said:

"Influence obtained by the use of lawful means by a wife or child is eminently right and proper, if exercised with proper and honest motives. But the influence obtained by the use of unlawful means, immoral and indecent conduct, is undue influence, and no one should be permitted to derive benefit or advantage therefrom."

It may be conceded that many courts have refused, in will contests, to indulge the presumption of undue influence arising from illicit relations which they so readily apply when the

validity of a deed is questioned. It may be that is the majority rule; if so, I would take my stand with the minority when and if we have to make a pronouncement on the subject.

There can be no doubt as to the long-continued relation existing between Shelangoski and Katherine Melinski. It was almost openly and brazenly flaunted in the very face of the children of Shelangoski and his wife and the public. For years, on many occasions, they occupied the same bedroom in the Melinski apartment. They were seen there by his children. When seen there by his children, the children were admonished to "go to their own room" and to say nothing about what they had seen. There was the trip in which they registered at a hotel as Mr. and Mrs. Shelangoski; they were seen frequently in the company of each other; the mother of his children remained at home while Shelangoski frequently was seen with Katherine Melinski, either at her home or in public places.

In addition to the evidence as to illicit relations there are in the record other facts and circumstances which bear upon the question of undue influence. Katherine sought to turn the father against his children, on one occasion referring to one of the girls as a "snake in the grass." She complained to decedent about the girls and their conduct. That she succeeded in that purpose might be readily inferred from the fact that for all practical purposes his will disinherited them.

Bertha Kupka, a daughter, and one of the appellants herein, testified that on one occasion Katherine Melinski struck her with a shoe. She further testified that Katherine on various occasions complained to testator about the girls. I quote:

"Q. Did you hear Katherine say anything to your father about the conduct of yourself and your sisters at any time while you were staying at her home? A. Yes, oftentimes I had heard, she called us liars and sneaks to him."

Irene Glider testified that she stayed in the apartment about twelve years; that Katherine told her to say nothing about how things were going on. She further stated that "Katherine told lies on us when father [testator] would come there."

Martha Johnston, an appellant, testified that her father

brought her to the Melinski home in Washington when she was seven years old and that when she left she was about twenty-three years old. She testified that while she and a sister were there her father frequently stayed overnight, and the girls were cautioned later that was not to be talked about outside; that it was "just one of those things" and not to say anything to anyone; that it "wasn't anyone's business." I quote from the testimony of Martha a question and answer which seem to me to throw considerable light upon the attitude of Katherine toward testator's children:

"Q. Tell the jury what she [Katherine] said to your father about your conduct and the conduct of your sisters? Did she tell your father anything that wasn't true about what your conduct was and what was it she said? A. Oh, that we were going around all hours of the night. If we were home by ten o'clock it would usually be ten-thirty, or eleven or twelve in her stories. It didn't make any difference who we knew, they were not any good."

This witness testified that she worked through the summer vacations before she graduated from school in 1931 and that her wages were handled by Katherine. Then there was evidence that when the children were small they were taken from the farm home to the home of Katherine in Washington. One witness testified that they hardly got acquainted with their mother. There was also evidence that when the father was away from Katherine he was kind to them; that when Katherine was with him his attitude seemed to change. There is evidence that after Katherine came into testator's home to stay she participated actively in the farm affairs and in dealings. There is likewise evidence that when testator's wife left the farm home, following the coming thereto of Katherine, she lived with various of her children, who contributed to her support; that after she left the farm home testator did not contribute to her support.

There was in the record testimony that up to the time the testator was enfeebled by sickness he was a person of strong will, independent, and with a dominating character. After a careful study of the record showing testator's weaknesses in the

direction of Katherine Melinski and his open and utter disregard of his wife and his children it might be inferred that, dominating as was his character, in the person of Katherine Melinski he found one who dominated him. I think that such a condition might reasonably be inferred. There can be little question that the bringing of Katherine into testator's home was the direct cause of testator's wife, the mother of his children, leaving her home and going to live with others—others who from that time on supported her. The jury could fairly infer that Katherine actively participated in the procurement of the will. The time when made and the circumstances attending its making are highly significant. True, the evidence is circumstantial, but in cases like this rarely is direct evidence obtainable. The inferences are there. Here the testator was in the last stages of a fatal malady, was weakened and enfeebled. Katherine became the beneficiary of substantially all of the property, and yet, within a few days following, we behold the travesty of a marriage ceremony. It could be reasonably inferred that Katherine had in mind in going through the marriage ceremony the uncertainties of the effect of the will and the consummation by marital relation was simply an anchor to the windward.

Katherine, so far as moral relations, owned the testator for close to forty years. She exhibited such control before testator's children and the public. She went into the home and her entrance there caused a true wife to depart. She procured the making of the will, thereby being devised the great bulk of the property, and then, as the final act, went through the mockery of a wedding ceremony, accompanied by the sordid observation to the effect that this should have been done long ago.

The majority opinion, while calling attention to some matters shown in the record which appellants claim showed the aversion of Katherine to them, and as seeking to turn testator against his children, states that this happened some seven years ago. The inference seems to be that this was too remote and that its effect had passed away. My understanding of the rule is that remoteness in itself does not exclude evidence that is competent; it merely goes to its weight—something not for the court but for the jury. On the other hand, various facts and

circumstances bearing upon this question were much more recent than seven years before. Again the jury might reasonably infer that such things would gain their end and leave Katherine in charge, as the evidence shows she was throughout the entire forty years. The jury could rightly consider the result, aided by the evidence of the nature and disposition of the principal beneficiary. They might properly infer that she exercised over the testator for about forty years an influence which transcended any which normally accompanies the ordinary affairs of life. Certainly one who could cause a husband to cast aside in a moral way the one to whom he had given a lifetime vow to love, cherish, and protect, who had borne him children, who had kept his home, and could cause testator to openly and brazenly flout before his children and the public his infidelity and unfaithfulness, I repeat, a jury might justly and reasonably infer that such person would go the whole way and cause the testator, out of his sin and weakness, to give to her substantially all of his property, thereby excluding his own flesh and blood.

I would reverse.

SMITH, J., joins in this dissent.

BLISS, J. (dissenting)—I have no disagreement with the majority opinion respecting any propositions of law stated therein but I think the issue of undue influence should have been submitted to the jury, and I dissent because of the failure of the trial court to do so.