IN RE WILL OF SADIE J. BROOKE.

MABEL BROOKE, Appellee, v. EDNA B. HOTCHKIN et al., Appellants.

No. 46970.

Talbott & Talbott, of Brooklyn, and McFarlin & McFarlin, of Montezuma, for appellants.

Cross & Hamill, of Newton, and Bray, Carson & McCoy, of Oskaloosa, for appellee.

OLIVER, J.—Sadie J. Brooke died in Grinnell, Iowa, November 12, 1944, aged seventy-three years. She had two daughters: Mabel, unmarried, and Edna B. Hotchkin, whose husband was a farmer. Edna had two adult sons, Roger and Stanley. Mabel offered for probate the purported will of Sadie J. Brooke, executed April 3, 1943. Edna and Roger filed objections, alleging the instrument was induced and procured by undue influence on the part of Mabel and Harry V. Moore. Trial to a jury resulted in a directed verdict for proponent and an order admitting the will to probate. Objectors have appealed.

Testatrix was divorced from her husband in 1919. From that time until 1927 she lived in Edna's farm home, near Grinnell. Thereafter she lived in her own home in Grinnell and Mabel lived with her most of the time. Testatrix owned this home, four hundred acres of land, valued at about $34,200, $5,500 in United States War Bonds, payable to testatrix or Mabel, and other personal property valued at about $5,100.

In 1928 testatrix made a will giving Edna eighty acres of land absolutely, a life estate in one hundred twenty acres, remainder to Edna's issue, and giving Mabel the home in Grinnell, eighty acres of land, and a life estate in one hundred twenty acres, remainder to Mabel's issue, if any, otherwise to Edna's issue, and dividing the residue of her estate between Mabel and Edna. In 1933 she executed a codicil which referred to money loaned to and (farm) rent unpaid by Edna and provided for

the cancellation of such indebtedness, to equalize which Edna was willed only a life estate in one hundred twenty acres, remainder to Edna's issue, and Mabel was willed two hundred eighty acres absolutely. The provisions of the will giving Mabel the home and dividing the residue of the estate were not changed.

The will here in question, executed April 3, 1943, gave Edna a life estate in a certain one hundred twenty acres of land, remainder to Edna's sons Stanley and Roger or the survivor. Edna's husband testified this was the poorest land owned by testatrix and was valued at $5,200. All the residue of the estate was willed to Mabel, who was nominated executrix, but if Mabel predeceased testatrix or they died by the same accident, said residue was to go to Harry V. Moore, the personalty absolutely and the real estate for his life, remainder of the real estate to Stanley and Roger Hotchkin or their survivor.

Mabel and Edna each owned one hundred acres of land and some other property which they had inherited. For some years Edna's husband rented the one hundred acres owned by Mabel. From 1921 to 1936 he had rented from testatrix the four hundred acres of farm land. Testatrix held unpaid rent notes made to her by him, which the trial court figured amounted to about $8,500.

Edna testified there had been some friction between Edna and Mabel over rents claimed by Mabel to be owing to her mother by Edna's husband. However, the record indicates this was not serious and that the relations between all three women were cordial and affectionate. Testatrix evidenced affection for Stanley and Roger also.

Testatrix and Mabel were very congenial. Mabel was usually with testatrix when the latter went to the bank or conferred with others about her business affairs. On these occasions Mabel frequently transacted her own business. The same agent handled the land of each and each had individual accounts at the same bank. There is no indication of any advice, interference, or attempted domination by either in the business affairs of the other. Both had access to the deposit box of testatrix at the bank.

Harry V. Moore, then a lieutenant, later a captain, in the United States Army, was stationed at Grinnell late in 1942. He had separated from his wife in August 1942. Apparently he met Mabel in November 1942. Thereafter he courted her ardently and continuously. He also showered testatrix with filial attentions and small gifts. He was with Mabel and testatrix at their home and elsewhere much of the time.

Testatrix was an educated woman. She was active and alert. She kept a diary which indicates the important place in her life occupied by Harry Moore from November 1942 until her death. His calls, in person and by telephone, his doings and his health, were matters of high moment. In January 1943 he was transferred to Michigan.

The diary record of numerous telegrams, telephone calls, and air-mail letters between him and Mabel and letters between him and testatrix evidences their importance to testatrix. Later, Harry was transferred to Miami, Florida. Mabel visited him first in Michigan and again in March at Miami. April 4, 1943, testatrix and Mabel left Grinnell to visit him at Miami. The will here in question was executed at Grinnell on the eve of their departure.

C. A. Blair and wife, friends of the Brookes, witnessed the execution of the will, April 3, 1943. Mabel telephoned the Blairs the Brookes wanted to see them. Testatrix and Mabel came to the Blair home together. Testatrix produced and executed her will and at her request the Blairs signed as witnesses. Then Mabel produced her own will and at her request the Blairs signed as witnesses. Testatrix and Mabel said they were going to Florida (early) the next day and could not get in the bank and asked Mr. Blair to keep the papers for them. He kept them until they called for them about a year later. Edna first learned of the will after her mother's death. It was then in testatrix' box at the bank. There was evidence that Harry Moore said he had placed it there just before they went to Denver (in April 1944).

Testatrix' will is in her own firm handwriting. It is in excellent legal form and its provisions and legal language are technically precise and correct. The record does not show from

what testatrix copied its provisions, but in form and language it differs substantially from her prior will, which was. drawn by the Grinnell lawyer who usually represented testatrix.

While Mabel and testatrix were visiting Harry Moore at Miami, Harry's wife unexpectedly appeared and testatrix learned of his marital status and that Mabel claimed to be his wife. Apparently this did not lessen testatrix' regard for Harry or Mabel. Harry was soon transferred from Miami to Indianapolis, Indiana. Testatrix and Mabel accompanied him and visited him there and shortly thereafter again visited him there. Subsequently they accompanied or followed him and visited him for extended periods at various other places where he was stationed. From time to time he had borrowed about $1,550 from testatrix and Mabel. Later he repaid testatrix $931.

Edna met Harry in 1944. Thereafter he participated in the family correspondence with her, her husband, and her sons. Edna at times referred to herself as his sister. The foregoing occurrences were subsequent to the date of the will. However, it may be fairly inferred that testatrix regarded Harry as a member of the family at the time she executed the instrument.

In sustaining proponent's motion for directed verdict the trial court referred to the prior will and stated testatrix had the right to make a subsequent will and thereby dispose of her property to whom and in such proportions as she saw fit, and that was true not only as to her children but also as to strangers to her blood line, provided she. had testamentary capacity and did not act by reason of undue influence; that Edna was married, had children, and her husband had some property; that Mabel was unmarried and had lived with testatrix for many years; that Mabel's presence at the time the will was made was explainable, since each of them made a will preparatory to starting their trip, and testatrix' will provided for the possibility of the death of both in the same accident; that apparently the entire family was infatuated with Captain Moore; that there was no evidence of fiduciary relationship; that there was no evidence tending to show or warranting the inference that either Mabel or Captain Moore did anything to influence testatrix in making

the will; that there was no evidence testatrix was enfeebled either in mind or body when she made the will and that the evidence showed that until very shortly before her death she was a woman of rather unusual mental ability.

We think the record supports these conclusions. The unequal distribution of a testator's property is not sufficient to establish undue influence. See Shaw v. Duro, 234 Iowa 778, 785, 14 N. W. 2d 241. Nor is undue influence established by proof of opportunity to exercise it. Worth v. Pierson, 208 Iowa 353, 359, 223 N. W. 752. The record does not show any matter or transaction in which Mabel or Harry dominated or attempted to dominate or advise testatrix or that testatrix was a person subject to undue influence or domination by anyone. She was capable, alert, active, and independent. She cared for herself and her home without difficulty when Mabel was absent on visits to Harry.

Her affection, for Mabel was deep. The record indicates she had also a maternal regard for Harry. She greatly enjoyed the company of both Mabel and Harry and apparently accompanied Mabel on various visits to Harry because of her desire to be with them. Apparently testatrix' regard for Harry actuated her in naming him as a beneficiary in case Mabel did not survive her. The record does not reasonably tend to show any undue influence on the part of Mabel or Harry or that the will was not the free expression and will of testatrix.

In the absence of such proof, Harry's motives and the propriety of the conduct between him and Mabel need not be considered. Glider v. Melinski, 238 Iowa 140, 150, 25 N. W. 2d 379, 384.

Other errors assigned by appellants, if established, would not warrant a reversal, and need not be considered.—Affirmed.

All JUSTICES concur.