IN RE ESTATE OF H. G. LOCHMILLER.

LOUIE LOCHMILLER et al., Contestants-Appellants, v. GLADYS E. LOCHMILLER, Proponent-Appellee.

No. 47134.

DECEMBER 16, 1947.

Andrew Bell, of Denison, and William P. Welch, of Logan, for appellants.

Floyd E. Page, of Denison, for appellee.

GARFIELD, J.—The only claim contestants-appellants make is that the trial court erred in withdrawing from the jury, because of insufficiency of the evidence, the issue of undue influence.

Contestants are the two sons, fifty-one and forty-five, and the daughter, forty, of testator's first marriage. Proponent, charged with exercise of undue influence, is testator's second wife, fifty-five, whom he married June 15, 1920, after the death of his first wife. The will was executed May 6, 1943, at an Omaha hospital, where testator, seventy-six, had been confined

with pneumonia since April 26th. Death resulted from the disease June 3, 1943. The will leaves each contestant $100 and the balance of the estate to proponent, who is nominated executrix to serve without bond. The record does not show the exact value of the estate but proponent says in argument the net value is $12,000 and we find no denial of the statement.

Except from 1915 to 1921, when testator resided in Denison, he lived on a farm near there. In March 1921 testator, proponent, and the seven-year-old son of her prior marriage moved to a farm which remained the family home until testator died. The contestant Rhinehart, testator's younger son, also returned to the farm for one year and the contestant daughter, Mildred, who was attending school, spent week ends there. Mildred was married in 1923 and left home. In early spring of 1943 testator was taken seriously ill with pneumonia. On April 26th he was taken to the Omaha hospital, where he remained until his death on June 3d.

Most of the evidence for contestants bears on the issue of mental incapacity. This issue in a will contest cannot be separated from that of undue influence. One who is infirm and mentally weak is more susceptible to influence than one who is not. In re Estate of Telsrow, 237 Iowa 672, 677, 678, 22 N. W. 2d 792, 796, and citations.

Testator was of sound mind up to the time he entered the hospital. There is evidence, however, principally from two nurses and a graduate intern, that during much of his stay in the hospital he was confused and delirious, imagined he was back on the farm caring for cattle and driving horses. The only reasonable inference is that this mental confusion was mainly caused by the toxic condition brought about by the pneumonia. There is evidence of hardened arteries such as are usual in persons of testator's age. In the last week or ten days before his death on June 3d testator's mental and physical condition grew worse and he was irrational more of the time.

Two other nurses, one of whom witnessed the will, the two attending doctors, several neighbors and relatives of testator (and of contestants) give testimony quite inconsistent with that of the nurses and intern above referred to. The most that

may be said is that the issue of mental incapacity was properly left to the jury, which found for proponent.

While testator was in the hospital proponent spent much time there. She sent for Mr. Page, an attorney at Denison, to come to Omaha, about seventy-five miles distant, to prepare the will. He arrived at the hospital with his stenographer between five and six p.m. Proponent was in the lobby of the hospital and told the attorney what her husband wanted in his will. She said she got this information from Mr. Lochmiller. Mr. Page and the stenographer went in an office in the hospital, where Page dictated the will and the stenographer typed it on a typewriter they had brought from Denison. Proponent was in the room part of the time the will was being dictated.

After the will was typed proponent took Page and his stenographer to the door of testator's room, introduced them to the nurse in charge, and then went away. When Mr. Page entered the room testator knew him and called him by name. Page said to testator, "You know what we are here for don't you, Henry?" Testator nodded his head in the affirmative. Mr. Page then said, "Your wife has told us what you want in this will. I am going to read it to you. If there is anything you want to change in the will, tell us and it will be changed." Page then read the will aloud and asked testator, "Is this the way you want the will, Henry?" and testator said, "Yes, that is as I planned it." He then signed the paper and it was witnessed by the nurse in charge, Mr. Page, and his stenographer. Proponent was not in the room.

Before Page arrived at the hospital proponent told the nurse he was coming and asked her to be a witness to the will. Page also asked the nurse if she would sign as a witness. The nurse replied she had never witnessed a will before and was "kind of leary or afraid to, but I did." About two weeks before the trial proponent and her son called on the nurse, who asked proponent in substance why she had the will "signed without calling his children in and talking it over with them too and she said they weren't around that day, or something." There is evidence the older son was in Omaha the day the will was made.

In August 1941 contestants Rhinehart and Mildred visited at their father's farm. Rhinehart testifies to this talk between proponent and Mildred on that visit:

"She [proponent] wondered what Mildred thought about whether dad should make a will. And Mildred said, 'I think he should make a will, especially with mixed families.' And Gladys [proponent] said, 'Well I have been trying to have him make a will but he always says he won't do it because he wants it to go the way the law will take care of it. He didn't want to make a will.' And she went on, 'If dad ever does make a will I will see to it that Louie doesn't get anything.' "

Mildred corroborates this testimony and adds that proponent also told her:

"It makes dad so mad when I say something about Louie. * * * It doesn't make him mad when I say something about you or Rhiney."

Proponent denies there was any such talk but, of course, upon this appeal we must accept contestants' testimony.

We have referred to the evidence upon which contestants claim the will is the product of proponent's undue influence. We agree with the trial court it is insufficient to warrant submission to the jury. There is no direct evidence of undue influence. Of course, such fact may be proven by circumstantial evidence. In re Estate of Telsrow, supra, 237 Iowa 672, 677, 22 N. W. 2d 792, 796, and citations. But the issue must not be left to conjecture. The proven circumstances must give rise to reasonable inferences that tend to show the will is the result of undue influence. Glider v. Melinski, 238 Iowa 140, 147–150, 25 N. W. 2d 379, 383, 384; In re Estate of Heller, 233 Iowa 1356, 1367, 11 N. W. 2d 586, 592.

The talk between Mildred and proponent was a year and nine months before the will was executed. The witnesses do not claim proponent said she had been trying to have testator make a will in her favor. Mildred agreed with proponent it was desirable for her father to make a will. Proponent made no threat that either Rhinehart or Mildred would be excluded from the will. Importunity, request, and persuasion that do not

go to the point of controlling the will of testator do not constitute undue influence. In re Estate of Hollis, 234 Iowa 761, 769, 12 N. W. 2d 576, 581, and citations.

In re Will of Richardson, 199 Iowa 1320, 1328, 1329, 202 N. W. 114, 118, frequently cited with approval, holds much stronger evidence than here of threats by two proponents in the presence of testatrix, about sixteen months before the will was made, "they would see that the mother made her will," that contestant and her sister "would not get a dollar, or only a dollar" and "they were going to fix it, to suit themselves," was insufficient proof of undue influence because it showed only a disposition to procure a will in proponents' favor to the exclusion of contestant and her sister. See, also, Zinkula v. Zinkula, 171 Iowa 287, 154 N. W. 158, and, as having some bearing, Glider v. Melinski, supra, and In re Estate of Hollis, supra.

That proponent sent for Mr. Page can hardly be called even a suspicious circumstance. Testator, confined to his bed in the hospital, was unable to summon an attorney. As might be expected of a dutiful wife, proponent was there with testator. It would be perfectly natural for him to ask proponent to send for Mr. Page and to tell her what he wanted in his will. The inference is Page was testator's attorney. At least, they were well acquainted.

As stated, there is evidence proponent told Page she got the information about what to put in the will from testator. There is no basis for a finding this is not the fact. The preparation of the will before it was taken to testator's room is not evidence of undue influence. That proponent was present part of the time it was being dictated shows no more than opportunity to exercise undue influence. This, of course, is insufficient. In re Will of Brooke, 238 Iowa 306, 310, 311, 26 N. W. 2d 688, 690, and citation. Indeed, a jury question on the issue of undue influence is not made by proof of opportunity and disposition to exercise it, plus persuasion and request that do not control the will. In re Estate of Heller, 233 Iowa 1356, 1367, 11 N. W. 2d 586, 592, and citations.

The reluctance of the nurse to act as a witness to the will is not surprising. She had never before witnessed a will. She

had known testator and his wife only two days. Mr. Page and his stenographer were strangers to her. She lived in Omaha; the others, in or near Denison. Nor is it proof of undue influence that shortly before the trial the nurse asked proponent why she had "the will signed without calling his children in and talking it over with them."

The record shows no transaction in which proponent dominated or attempted to dominate testator nor is it shown, except for the evidence of mental incapacity, he was a person subject to undue influence or domination by anyone. There is no evidence of any fiduciary relation between testator and proponent.

Where there is evidence of undue influence, the fact a will is unnatural, unjust, or unreasonable is proper to be considered as tending to confirm the claim of undue influence. In re Estate of Telsrow, supra, 237 Iowa 672, 678, 22 N. W. 2d 792, 796, and citations. But unequal distribution is not sufficient to establish undue influence. In re Will of Brooke, 238 Iowa 306, 26 N. W. 2d 688, and citation.

Of course, testator's will disposes of his property in a different manner than the laws of intestacy. Obviously, if he had desired his property to go as provided by such laws there would be no occasion for making a will. Zinkula v. Zinkula, 171 Iowa 287, 299, 300, 154 N. W. 158. But it cannot be said under the record this will is unnatural, unjust, or unreasonable. Proponent made a strong showing of work done by her for the nearly twenty-three years of her marriage to testator.

Proponent raised and dressed chickens, ducks, geese, and turkeys, sold them in Denison, and shipped them to Chicago. Once on a single day, with the help of her son and testator, she dressed eighty chickens and delivered most of them to customers in Denison. Her sales of eggs averaged $25 a week during the last year. She picked and sold cherries and strawberries. She always churned butter and during the first few years sold about thirty-five pounds a week. The income from her endeavors went with other farm income. She cared for a large garden, canned two hundred to three hundred quarts of vegetables and fruits each summer, and also canned the meat butchered by them. She helped with the chores, in the fields, and with corn picking. Proponent and testator were congenial and de-

voted. Proponent's son stayed on the farm and worked until 1937, although he attended school near by until 1929. He and testator were intimate and on good terms throughout.

Contestants sometimes treated proponent with discourtesy and at times insulted her. This displeased testator. Contestants exhibited indifference and ingratitude toward their father. The sons quarreled with him. Louie was at the farm only two or three times during the twenty-two years from 1921 to 1943, although he lived in Denison until 1934. Rhinehart moved to California in 1927 and was back at the farm only four times thereafter. Once was when his first wife died in 1928. Rhinehart, at his father's expense, had sent his first wife back to the farm with a fatal malady and proponent took care of her for a month until she died. (After leaving the farm in 1922 Rhinehart returned there in 1923 for about three years.) From 1923 to about 1935, when she moved to California, Mildred lived in Sioux City, about seventy-five miles from Denison. She visited at her father's home only four or five times. In 1939 testator and proponent visited Mildred in California for about two weeks, when she told them to leave because Mildred and her husband were not getting their sleep. During testator's fatal illness each contestant was asked to donate blood for blood transfusions for the father but none of them did so.

During his life testator advanced considerable money to or for the benefit of his sons. A garage business with Louie between 1915 and 1919 evidently cost the father several thousand dollars. Louie and his wife lived in a house belonging to testator for which no rent seems to have been paid. They also charged groceries to testator and proponent paid for them. Louie admits he has been a professional gambler at times, both in Denison and away. Testator paid a fine of $525 against Rhinehart for bootlegging and apparently made good a default by him of $800 to a concern for which he was working. Proponent advanced Rhinehart $300 and $200, none of which was repaid. Testator paid the expenses of the last sickness and burial of Rhinehart's first wife.

Without further reference to the testimony, it is apparent testator may well have been much disappointed with con-

testants, felt he had done enough for them, was grateful for the help and devotion of proponent and considered her justly entitled to the bulk of his estate.

The evidence of undue influence here is much weaker than in In re Estate of Telsrow, 237 Iowa 672, 22 N. W. 2d 792, Shaw v. Duro, 234 Iowa .778, 14 N. W. 2d 241, and other cases cited by contestants, and in In re Will Contest of Soderland, 239 Iowa ——, 30 N. W. 2d 128.—Affirmed.

OLIVER, C. J., and BLISS, HALE, SMITH, MULRONEY, and HAYS, JJ., concur.